In the

# United States Court of Appeals
### For the Seventh Circuit

———————

No. 03-4077

JAIDIBE TAPIERO DE OREJUELA,
JUAN JOSE OREJUELA TAPIERO,
CARLOS ANDRES OREJUELA, and
SAUL OREJUELA,

*Petitioners,*

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

———————

Petition for Review of an Order
of the Board of Immigration Appeals.
Nos. A79-592-346, A79-592-347,
A79-588-828, A79-588-829.

———————

ARGUED NOVEMBER 10, 2004—DECIDED SEPTEMBER 8, 2005

———————

Before POSNER, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* Jaidibe Tapiero de Orejuela and
her three sons, Saul Alberto, Carlos Andres, and Juan Jose,
fled Colombia after the Revolutionary Armed Forces of
Colombia (FARC, standing for Fuerzas Armadas de Colom-
bia) murdered Jaidibe's husband and the father of her
children and then continued its threats on the family. The
Orejuelas applied for asylum based on their persecution as
members of the educated, wealthy, landowning class in

Colombia that opposed FARC, as members of the immediate family of the deceased Mr. Orejuela, and based on their political opinions in opposition to FARC's communist doctrine. The Immigration Judge (IJ) denied their applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). The Board of Immigration Appeals (BIA) summarily affirmed the IJ's decision. We conclude that the Orejuelas have shown that they are members of a persecuted social group. We therefore grant the petition for review and remand for further consideration of their claim.

# I

Internal conflict and violence that is both political and criminal continue to challenge Colombian society. The government's security forces, paramilitary groups, guerrilla groups, and drug traffickers all fight one another. FARC is a leftist guerrilla group that originally was established to serve as the military wing of the Colombian Communist Party. Where FARC exercises control, according to the 2001 United States Department of State Country Report, it collects "war taxes," conscripts members of the citizenry, regulates travel and commerce, and in effect displaces civil government. Even where FARC does not fully displace the civilian government, it nevertheless operates almost without impunity as a result of a reign of terror that targets police and military officials, their families, and those who cooperate with them. According to the United Nations High Commissioner for Refugees:

> [T]he FARC launched a concerted campaign of threats and intimidation against local authorities, as part of a strategy to further undermine State authority and destabilize the government. According to the Ministry of Interior, over 300 mayors . . . have received direct threats, and many have gone into hiding or conduct

their office from different municipalities. The FARC have issued various statements indicating that all departmental and municipal authorities in the country are targeted. A total of sixty mayors (that is to say, one per month on average) have been killed in Colombia during the past five years.

Attorneys, judges, victims, witnesses and other persons who participate in proceedings and investigations related to violations of human rights or humanitarian law, involving members of the public security forces or paramilitary or guerilla groups, face serious risks. . . . [M]embers of the judiciary face increasing threats from the side of the FARC for the mere fact of being public officials.

United Nations High Commissioner for Refugees, International Protection Considerations Regarding Colombian Asylum-Seekers and Refugees ¶¶ 51-52 (Geneva, Sept. 2002). As a consequence of this violent campaign, the military and civilian forces of Colombia have proven unwilling and unable to control FARC.

The 2001 Country Report describes FARC's consistent use of kidnapping as "an unambiguous, standing policy and major source of revenue." The Country Report also indicates that in March 2000, FARC instituted "Law 002," which targets the wealthy in particular. According to FARC, all those with assets over $1 million must pay taxes to FARC or face kidnapping. FARC often kidnaps and/or extorts "persons deemed to hold an opposing political opinion" and uses this practice "to finance [its] political/military objectives, targeting members of the middle and upper classes, those engaged in business, and others seen as possible sources of funds." United Nations High Commissioner for Refugees, International Protection Considerations ¶ 47. "Due to the significance of the income derived from ransom and extortion to fund political-military activities," the

report continues, "refusal or inability to pay is viewed as an act or indication of political opposition." *Id.*

Mr. and Mrs. Orejuela were married in 1974. Shortly thereafter, Mr. Orejuela began purchasing real estate. In 1981, he purchased a 2.5 acre farm called Yolandita in the province of Cauca, on which he grew coffee beans and bananas. In 1989, he purchased two large ranches known as Arabia and La Esperanza, also in the province of Cauca, on which he raised cattle and other livestock. He hired managers for each of these estates. In 1994, the family purchased a home in Cali, the capital of Cauca.

In August 1999, while he was visiting one of his ranches, a group of FARC guerrillas threatened Mr. Orejuela, demanding money to support their efforts. According to his wife, Mr. Orejuela refused because he did not support FARC's communist ideology. FARC representatives told him that they would kill him if he did not pay. Around the same time, Saul and Carlos noticed that they were being followed when they drove to the Universidad Autonóma de Occidente where they both studied as well as when they walked around campus. One day, Carlos received an anonymous call shortly after he returned home from the university indicating that the person knew that he had just returned home.

FARC made good on its threats two months later. On November 9, 1999, Mr. Orejuela stopped at a bakery near his home. A man approached Mr. Orejuela from behind. When Mr. Orejuela turned around, the man shot him twice in the head, killing him. Mrs. Orejuela asked the government to investigate her husband's murder, but a local judge advised her that pursuing the matter could endanger her children.

In October 2000, a group of approximately 25 FARC guerrillas approached Saul and Carlos when they went

to pay the workers on one of the ranches. (The sons testified that they visited the ranches every two weeks on Fridays or Saturdays for this purpose.) The guerrillas asked if the brothers were Saul and Carlos and demanded $20,000 from them. Saul testified that the guerrillas told them that they knew "all of our movements, everything we did, where we studied. That they knew where we lived and also about my [younger] brother." The guerrillas warned Saul and Carlos that if they did not "collaborate with them" they would "run with the same luck as our father." According to Saul, when he asked why FARC was doing this to his family, the guerrillas responded that it was because the Orejuelas had more than so many others and had been able to study at the university. About a month later, Saul and Carlos fled Colombia for the United States.

Mrs. Orejuela remained in Colombia with her youngest son Juan, but FARC soon focused its unwelcome attention on her. FARC sent two letters to Mrs. Orejuela demanding payment; in the second letter, FARC threatened to kill Juan if she failed to do so. Mrs. Orejuela took the threats seriously and brought them to the attention of the local authorities, who unhelpfully responded that she should leave the country because there was no protection for her in Colombia. During this time, she removed Juan from school and went to live with her sister in a less affluent area of Cali. About two weeks after receiving the letters, she sent Juan to live in the United States. Mrs. Orejuela stayed in Colombia until June 2001; during that time, she hid from FARC and did not return to her home or the family's ranches. In June 2001, Mrs. Orejuela joined her sons in the United States.

At their March 6, 2002, removal hearing, the Orejuelas requested asylum, withholding of removal, and protection under the CAT. On April 26, 2002, the IJ denied the Orejuelas' applications for asylum, finding that they had not established either past persecution or a

well-founded fear of future persecution on the basis of "a particular social group that is cognizable under the Immigration and Nationality Act." The IJ concluded that FARC did not kill Mr. Orejuela because of his political opinions, but because of his wealth:

> [T]he facts establish that the FARC demanded money, not because of respondent's political opinion or membership in a particular social group, but because the respondent was wealthy and the FARC wanted money. . . . Although the respondent testified that her husband's refusal was because he was not in agreement with their communist ideology, the FARC demanded the money because her husband was a wealthy cattle farmer rather than because of his political beliefs.

The IJ found that the record did not support the conclusion that FARC viewed the refusal to pay as a political statement. While the IJ credited a Reuters article that reported the guerrillas targeted cattle farmers for extortion, he found that this proved the extortion was for money rather than for political views.

The IJ concluded that the Orejuelas' status as wealthy landowners was not an "immutable characteristic" as defined by the BIA in *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985), because their status as such was not "something that the respondent[s] cannot change, or should not be required to change." In addition, the IJ found that the Orejuelas "failed to establish country-wide persecution" because some of their other family members were safe in Colombia and Mrs. Orejuela was safe while she stayed with her sister in a less prosperous neighborhood in Cali. Finally, the IJ denied the family withholding of removal and relief under the CAT. The BIA summarily affirmed the IJ's decision on October 29, 2003, and the petitioners filed a timely appeal.

## II

Before addressing the Orejuelas' petitions, we note that Congress's recent enactment of the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 731, amended 8 U.S.C. § 1158(b), thereby altering an alien's burden of proof in asylum claims. See REAL ID Act § 101(3). However, these new burdens apply only to applications filed on or after the date of enactment, May 11, 2005, long after the Orejuelas filed their applications. See REAL ID Act § 101(h)(2). The REAL ID Act also changed our standard of review for removal orders, see § 101(e), to require that "[n]o court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." This amendment is effective for cases "in which the final administrative removal order is or was issued before, on, or after [May 11, 2005]." This provision would apply to the Orejuelas' petitions, but it is not relevant because the IJ did not make any findings regarding corroborating evidence in this case.

In cases where the BIA summarily affirms the IJ, we review the IJ's decision as if it were the BIA's. *Jamal-Daoud v. Gonzales*, 403 F.3d 918, 922 (7th Cir. 2005). Our review of the Orejuelas' claims for asylum, withholding of removal, and relief under the CAT are governed by the substantial evidence standard. *Id.* "Applying that standard, we assess whether the BIA's determination was 'supported by reasonable, substantial, and probative evidence on the record considered as a whole,' and reverse only if the evidence compels a contrary conclusion." *Ahmed v. Ashcroft*, 348 F.3d 611, 615 (7th Cir. 2003) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). We will overturn the BIA's decision only "if the record compels a contrary result." *Brucaj v. Ashcroft*, 381 F.3d 602, 606 (7th Cir. 2004) (citing *Georgis v. Ashcroft*, 328 F.3d 962,

967-68 (7th Cir. 2003)). We review the BIA's legal conclusions *de novo*. *Ahmed*, 348 F.3d at 615.

The petitioners appeal the decision of the BIA denying them asylum. They argue that the IJ erred in his conclusion that FARC did not persecute them on the basis of their membership in two social groups—the group of individuals who are educated, wealthy, landowning, cattle-farming Colombians and the group of individuals in Mr. Orejuela's immediate family. In addition, they contend that the IJ wrongly rejected their claims that their persecution by FARC was based on their political opinion and that they faced country-wide persecution.

To qualify for asylum, the Orejuelas must first show that they satisfy the statutory definition of a "refugee": someone who is unable or unwilling to return to her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). The Orejuelas can meet their burden by proving either past persecution or a well-founded fear of future persecution. *Tolosa v. Ashcroft*, 384 F.3d 906, 908 (7th Cir. 2004). "A petitioner's experience of past persecution gives rise to a rebuttable presumption that she will face future persecution." *Id.* (citing 8 C.F.R. § 208.13(b)(1)(I)). To be granted asylum based on a well-founded fear of future persecution, the petitioners must show with credible and specific evidence that they will suffer persecution upon return to Colombia. *Vujisic v. INS*, 224 F.3d 578, 580 (7th Cir. 2000). Persecution can be by the government itself or by a group that the government is "unable or unwilling to control." *Balogun v. Ashcroft*, 374 F.3d 492, 499 n.8 (7th Cir. 2004) (quoting *Borja v. INS*, 175 F.3d 732, 735 n.1 (9th Cir. 1999) (en banc)).

Turning first to the issue of whether the Orejuelas' persecution was based on their membership in a social group, we have held, following the Board, that a character-

istic that defines a "social group" within the meaning of the immigration laws "must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Lwin v. INS*, 144 F.3d 505, 512 (7th Cir. 1998) (adopting the BIA's standard for determining a social group articulated in *Acosta*, 19 I. & N. Dec. at 233, though rejecting immutability as a necessary prerequisite for the shared characteristic). The Board in *Acosta* further described this test: "The shared characteristic might be an innate one such as sex, color, or *kinship ties*, or in some circumstances it might be a shared past experience such as former military leadership or *land ownership*. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis." 19 I. & N. at 233 (emphasis added). Thus, the inquiry should focus on "whether the danger flows from an ongoing violent struggle affecting the population in a relatively *undifferentiated* way or if danger exists on account of a protected ground." *Ahmed*, 348 F.3d at 619 (emphasis added). A particular characteristic that defines a social group within a society such as education, manner of speech, or profession may be more mutable than one's race, ethnicity, or religion, but these traits are nevertheless distinguishing markers within a given society that are not easily changed or hidden.

Applying this social group test from *Acosta*, the Orejuelas fall into a distinct social group: the educated, landowning class of cattle farmers targeted by FARC. The State Department's Country Report, citing the Free Country Foundation, notes that cattlemen are among the guerrillas' "preferred victims." This group is not defined merely by wealth, a characteristic that standing alone was rejected by the Board in *In re V-T-S-*, 21 I. & N. Dec. 792, 799 (1997), but by their ownership of land, their social position as cattle farmers, and their education. (Saul Orejuela testified that when he

was threatened, he was told by the FARC guerrillas that it was because his family belonged to a "privileged group" and that he and his brothers had gone to schools and universities; he also testified that the guerrillas focused on them because his father was "renowned" as a cattle rancher.) In *Acosta*, the Board recognized that "shared past experiences" including land ownership and past military service may constitute a characteristic that is a basis for a social group designation. Here, the Orejuelas possess land of a particular type (cattle ranches) and the educational status that combined make the Orejuelas and those like them targets of FARC's violent campaign.

Furthermore, even if the family were to give up its land, its cattle farming, and even its educational opportunities, there is no reason to believe that they would escape persecution. In discussing former public officials, the United Nations High Commissioner for Refugees noted that "the individual concerned is not able to avoid persecution simply by quitting his/her function and relocating elsewhere with a different job." United Nations High Commissioner for Refugees, International Protection Considerations ¶ 52. Mrs. Orejuela testified that she believed she would still be targeted if the family sold the cattle ranches, as FARC would continue its quest for funding by targeting the family regardless because of its past membership in the cattle farmer, landowning class.

We are aware that many other Colombians, including poor farmers, are victims of violence by FARC, but this does not mean that wealthy landowners are not targeted as such. The existence of other persecuted social groups, such as members of a particular village who resisted a paramilitary organization, does not mean that any one group does not qualify under the statute.

The Orejuelas have shown that the persecution they faced was serious indeed. It included the murder of Mr. Orejuela,

repeated attempts at extortion, and various death threats. This is more than enough to show past persecution. They have shown that their suffering was differentiated from the rest of the population and that FARC targeted them because of their particular social group identity. The threats against them did not constitute indiscriminate violence. While we are sure that FARC would be happy to take the opportunity to rob any Colombian (or foreigner for that matter) of his money, it is those who can be identified and targeted as the wealthy landowners that are at continued risk once they have been approached and refused to cooperate with FARC's demands. While it might also be possible to find that the Orejuelas were members of a smaller social group consisting of the immediate family members of Mr. Orejuela, see *Iliev v. INS*, 127 F.3d 638, 642 (7th Cir. 1997), we need not consider this because we find that they are members of the social group comprised of the educated, landowning class. (Readers of Isabel Allende's *The House of the Spirits* or Gabriel García Márquez's *One Hundred Years of Solitude* will recall that the history of conflict between large landowners and the rest of society is a long one in Latin America.)

Our conclusion is entirely consistent with the Supreme Court's decision in *INS v. Elias-Zacarias*. In that case, the Court had to decide whether a guerrilla organization's efforts to conscript a person into its military forces necessarily amounted to persecution on account of political opinion. 502 U.S. at 481. The Court concluded that the answer was no. *Id.* at 483. Persons resisting recruitment might have many reasons to do so, including fear of combat, a desire to remain at home, and a desire to earn more money. Nothing in the record showed that the petitioner's motive was political; in fact, it indicated that he resisted purely out of fear for his family. *Id.* at 482. Second, the Court pointed out that the critical question for persecution based on political opinion is the opinion of the victim, not

the opinion of the persecutor. *Id.* *Elias-Zacarias* had nothing to say about persecution on account of membership in a social group, which is the Orejuelas' preferred theory.

It is true that the Orejuelas advanced political opinion as an alternate ground for their petition, but the IJ found that the evidence did not support this part of their claim. We see nothing in the record that undermines that ruling. The petitioners argue that their refusal to support FARC was based on their political beliefs (*i.e.*, opposition to communism) and that other courts have found that threats of extortion amount to political persecution. See, *e.g.*, *Borja*, 175 F.3d 732 (finding political persecution existed in a claim by a Filipino woman who received death threats after refusing to continue to pay a communist guerrilla organization). Nevertheless, just as the petitioner in *Elias-Zacarias* needed to show that a political reason lay behind his resistance to joining the military group, the Orejuelas would have had to show that politics rather than many other likely reasons lay behind their unwillingness to support FARC.

The facts presented by the Orejuelas did not compel the IJ to reach that conclusion. While Mrs. Orejuela testified that her husband refused to pay FARC because he disagreed with its communist ideology, there is no evidence in the record that any of the petitioners were politically active in opposing FARC other than through their efforts to manage their land without paying the "tax" demanded by FARC. The most one might say is that members of the privileged landowning class are unlikely to share the communist ideology of FARC members. This, however, takes us back to persecution on the basis of membership in a social group as opposed to persecution on the basis of political opinion or even mixed motives. See *Mohideen v. Gonzales*, 2005 WL 1691597 (7th Cir. July 21, 2005).

Finally, the Orejuelas contest the IJ's conclusion that

relocation within Colombia is a realistic possibility for them. As the U.S. Department of State Country Report indicates, FARC has a presence throughout the country and an increasing presence in the urban areas. Even though Mrs. Orejuela was able to live at her sister's home for a few months, she continued to receive threats by FARC at her home within the same city of Cali. This is not enough to show that the Orejuelas could safely relocate within the country. Given FARC's presence throughout Colombia and the family's identity, we conclude that this is not an alternate ground on which to uphold the IJ's decision.

For these reasons, we GRANT the petition for review and REMAND this matter to the BIA for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*