**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

*(Submitted May 9, 2006)*
Decided September 12, 2006

**Before**

Hon. RICHARD D. CUDAHY, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

No. 05-2249

| | |
|---|---|
| OSCAR HUMBERTO SANCHEZ-MELO, JOHANNA CAROLINA PENUELA-NOGERA, and BRANDON SANCHEZ-PENUELA, | Petition for Review of a Decision of the Board of Immigration Appeals |
| *Petitioners,* | Nos. A95-570-597, A95-570-598, A95-570-599 |
| *v.* | |
| ALBERTO R. GONZALES, Attorney General of the United States, | |
| *Respondent.* | |

**O R D E R**

Oscar Humberto Sanchez-Melo, a native and citizen of Colombia, petitioned for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), claiming that the leftist guerilla group Fuerzas Armadas de Colombia (FARC) had persecuted him because of his membership in the class of "wealthy land and property owners" in Colombia. Sanchez-Melo's wife and minor son brought derivative claims. The immigration judge found the family ineligible for asylum, because they had

filed their application more than a year after their arrival in the United States and they had not shown any extraordinary circumstances that justified the delay. The IJ also rejected their claims for withholding of removal and relief under the CAT, and the BIA adopted his opinion with a brief additional statement. This petition for review, on behalf of all three family members, followed. We find the IJ's determinations with respect to withholding and the CAT to be supported by substantial evidence, and we thus deny the petition to that extent. We dismiss the petition insofar as it addresses the asylum claims for lack of jurisdiction.

**I**

Sanchez-Melo and his family entered the United States at Miami in September 2000 with authorization to remain as visitors for pleasure until September 2001. Sanchez-Melo testified that he intended to apply for asylum on arrival, and he brought with him tapes of telephone calls and a letter from FARC to prove that he had been targeted for extortion. He did nothing, however, until May 2002, when he finally submitted an asylum application more than six months after the expiration of his authorized stay. (He claimed that the delay was because he could not afford a lawyer and had difficulty speaking English.) The immigration authorities promptly denied his application, and in June 2002 he received a Notice to Appear initiating removal proceedings against him (which included the derivative claims of his family members – a point we will not mention further).

The IJ credited Sanchez-Melo's account of his encounters with FARC. First, Sanchez-Melo testified that his brother, who was a subcommander with the national police in Algeciras Huila, Colombia, was killed in December 1998 when he attempted to stop a group of FARC guerillas from robbing a bank. The murder followed a number of death threats warning the brother that he would be killed if he did not accede to FARC's demands. At that time, Sanchez-Melo and the rest of his family were living in Bogotá, Colombia. They did not then, or for some time thereafter, have any contact with FARC. Although the hardware store that Sanchez-Melo owned jointly with his father was robbed twice in 1999, Sanchez-Melo did not believe that FARC was behind the robberies; instead, he assumed, they were just a part of the "common delinquency in Colombia."

In early 2000, things were looking good for the family. Sanchez-Melo purchased land abutting the store property and began to build a new warehouse. He also began to sell off his old machinery, with the idea of replacing it with "bigger and more modern machines." Sanchez-Melo's parents received a grant of 200 million pesos (which in 2000 would have amounted to about $95,790.00, see http://www.worldpress.org/profiles/Colombia.cfm) from the national government in compensation for his brother's death. His parents used part of the money to buy a farm in another area.

Sanchez-Melo's personal troubles with FARC began in July 2000, when representatives of the group approached him and his family with a demand for money. A letter addressed to Sanchez-Melo's father was delivered to the hardware store, warning him that FARC was aware of his "economic patrimony" and that it intended to require a contribution to its cause. On the same day, a FARC guerilla telephoned Sanchez-Melo's father at the store to reinforce the message.

Although it was his father who received these first two messages, Sanchez-Melo himself sought protection from the police; they assigned an officer to his case. The officer asked Sanchez-Melo to send his wife and son to a safe place and then to help the police catch the guerillas by playing FARC's "game." Sanchez-Melo agreed to cooperate, and so the police installed recording equipment on his telephone and instructed him to record any calls from FARC with their dates and times. Over the next few weeks, he taped a number of calls; the transcripts of those calls are in the administrative record.

In one of the first calls, the caller told Sanchez-Melo that his family had been "assigned" a "quota" of 300 million pesos. When Sanchez-Melo protested that he did not have that kind of money, the caller responded that he could pay off the debt in installments. The caller also reminded Sanchez-Melo of the money that his parents had received because of his brother's death. The caller assured Sanchez-Melo that he would not take it all, but that he wanted to "talk seriously" about it.

Sanchez-Melo made excuses for not getting the money together; at times he attempted to prolong calls that were difficult to trace. The police eventually determined that the FARC caller was using a cellphone and traveling around by car. Meanwhile, the caller was losing patience with Sanchez-Melo's evasiveness. On one occasion, he warned Sanchez-Melo that he "should have been declared a military target" and that he had been spared thus far only because of the "compassion" of the caller and his companions. At the end of the conversation, the caller threatened to double the assessment *and* "declare [Sanchez-Melo] a military target" if he did not come up with some of the money by the next day. Sanchez-Melo did not comply, however, and the calls continued. Shortly after this exchange, the police asked Sanchez-Melo to offer FARC a small amount of money to be picked up in person so that they could capture a few of those involved. He offered, but FARC refused to take the bait. The caller ordered Sanchez-Melo to deposit the money in a certain bank account instead, and then warned him that "[t]his is no longer about money, it's personal."

This was when Sanchez-Melo decided that it was too dangerous to stay in Colombia. He closed the hardware store and two weeks later was in the United States with his wife and son. His father, mother, and sister, remained in Colombia, but "in hiding." It appears that they have not been harmed, but at the time of the asylum hearing Sanchez-Melo's father was still receiving calls asking about his son and about

why he had not produced the money.

The IJ denied Sanchez-Melo's asylum claim for two reasons: first, he had failed to apply for asylum within the normal one-year window, and second, he had not shown the sort of extraordinary circumstances that would warrant relief from the one-year rule. For good measure, the IJ added that he would have been ineligible for asylum in any event, because the extortion efforts of FARC did not amount to persecution. FARC had never mentioned political opinion, either actual or imputed, so that ground was out. Nor did the IJ think that Sanchez-Melo merited relief as a member of the social group of "wealthy property owners," reasoning that neither wealth nor ownership of property were immutable traits or characteristics fundamental to identity and conscience. The IJ rejected the withholding of removal claim because Sanchez-Melo's failure to meet the more lenient burden on the merits for asylum meant necessarily that he could not satisfy the withholding standard. Finally, the IJ rejected his CAT claim because he never established that he had been, or was likely to be, subject to "severe pain and suffering," or that his suffering was sufficiently tied to the acts of a public official. The BIA affirmed.

## II

Because the BIA adopted the reasoning of the IJ, we review the IJ's opinion directly. See *Hernandez-Baena v. Gonzales,* 417 F.3d 720, 723 (7th Cir. 2005). This court will uphold the IJ's determination unless a contrary conclusion is compelled on the record. See *INS v. Elias-Zacharias,* 502 U.S. 478, 483-84 (1992); *Tapiero de Orejuela v. Gonzales,* 423 F.3d 666, 671 (7th Cir. 2005).

Sanchez-Melo's principal argument is that the IJ applied inappropriate standards when he evaluated the asylum claims. But this court cannot reach the asylum issue on the merits if we lack jurisdiction over this part of the petition. The IJ found Sanchez-Melo ineligible for asylum because he failed to file his application within one year of his arrival in the United States, as required by 8 U.S.C. § 1158(a)(2)(B). The IJ also found that Sanchez-Melo failed to establish that he fell within the exception for extraordinary circumstances recognized in 8 U.S.C. § 1158(a)(2)(D). As the government points out, the statute explicitly says that "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2)." See 8 U.S.C. § 1158(a)(3); *Vasile v. Gonzales*, 417 F.3d 766, 768-69 (7th Cir. 2005). As we explained in *Vasile,* determinations about compliance with the one-year time period or reasons for extending it fall within the bar of § 1158(a)(3), notwithstanding the REAL ID Act of 2005, Pub. L. No. 109-13, § 106(a)(1)(ii) (permitting judicial review of constitutional questions and questions of law). Thus, we dismiss this petition insofar as it challenges Sanchez-Melo's asylum claim.

This leaves before us his arguments for withholding of removal and relief under

the CAT, which are not subject to the one-year rule. In order to obtain withholding of removal under 8 U.S.C. § 1231(b)(3), the alien must show a clear probability that he will face persecution in the country to which he will be removed. *INS v. Stevic,* 467 U.S. 407, 430 (1984). The withholding standard is more stringent than the one required for asylum, under which the alien must show only a well-founded fear of persecution and need not "prove that it is more likely than not that he or she will be persecuted in his or her home country." See *INS v. Cardoza-Fonseca,* 480 U.S. 421, 449 (1987). If, on the merits, the alien cannot meet the standard of proof required for asylum, logic compels rejection of his asylum claim also. For this limited purpose, we therefore turn to the merits of Sanchez-Melo's case.

He first argues that the IJ erred in concluding that he was not persecuted on account of his political opinion. In his view, FARC's use of the term "military target" indicated that he was "fair game for political assassination." But this is sheer speculation: there is nothing in this record to explain what FARC meant here (or typically) when it used that term, other than to designate who was on its hit list. Second, Sanchez-Melo tries to tie his refusal to pay FARC to political opposition. We have, however, already rejected similar arguments that refusal to cooperate with FARC must be understood as an expression of political opinion, in the absence of other evidence of political activity. See *Tapiero de Orejuela,* 423 F.3d at 673-74; *Hernandez-Baena,* 417 F.3d at 723-24. Third, Sanchez-Melo argues that he is entitled to the "benefit of the doubt," because FARC may have had mixed motives for its actions. Without evidence that political opinion played any part in FARC's heavy-handed tactics, however, the IJ was certainly not compelled to view the record this way.

Sanchez-Melo next argues that the IJ should have found him eligible for asylum as a member of a "cognizable social group of wealthy land and property owners." In *Tapiero de Orejuela*, we did recognize the existence of a distinct Colombia social group defined as "the educated, landowning class of cattle farmers targeted by FARC." 423 F.3d at 672. But wealth was not the only distinguishing characteristic. We looked to a number of "distinguishing markers," such as education, manner of speech, social position, and profession, "that are not easily changed or hidden." *Id.* The agency has considerable discretion in defining the boundaries of social groups, and we cannot say here that the IJ's decision rejecting wealth alone was impermissible. We add that the only group with which FARC appears to have identified Sanchez-Melo is "the rich": in one telephone conversation, the caller asks rhetorically "why do the rich cry so much?"

Although Sanchez-Melo pressed a claim under the CAT before the IJ and the BIA, he did not develop any argument on this point in his brief before this court. He has therefore waived the point. See *Asere v. Gonzales,* 439 F.3d 378, 381 (7th Cir. 2006).

**III**

For these reasons, we **DENY** the petition of Sanchez-Melo, Johanna Carolina Penuela Nogera, and Brandon Sanchez-Penuela for review of the decision rejecting their claims for withholding of removal and relief under the CAT, and we **DISMISS** the petition insofar as it challenges the denial of asylum.