[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-16212

_____

BIA No. A95-906-140

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 9, 2007
THOMAS K. KAHN
CLERK

JENNY MILENA GARCIA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(February 9, 2007)**

Before EDMONDSON, Chief Judge, BARKETT and COX, Circuit Judges.

PER CURIAM:

Jenny Milena Garcia ("Garcia") petitions for review of the Board of

Immigration Appeals' ("BIA") adoption of the Immigration Judge's ("IJ") order of

removal and denial of Garcia's application for asylum and withholding of removal

under the Immigration and Nationality Act ("INA") and the United Nations

Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or

Punishment ("CAT").  8 U.S.C. §§ 1158, 1231(b)(3), 8 C.F.R. § 208.16(c).  We

deny the petition.


## I.  BACKGROUND


Garcia, a thirty-two year old native and citizen of Colombia, was admitted to

the United States in October 2001 and authorized to remain until 15 April 2002.  In

August 2002, Garcia applied for asylum pursuant to INA § 208, 8 U.S.C. § 1158,

and withholding of removal pursuant to INA § 241(b)(3), 8 U.S.C. §1231(b)(3),

claiming that she would be persecuted by the National Liberation Army ("ELN")

on account of her political opinion or membership in a particular social group if

she returned to Colombia.  On 3 October 2002, the former Immigration and

Naturalization Service[1] issued Garcia a Notice to Appear, charging her with

removability under section 237(a)(1)(B) of the INA as an nonimmigrant who

remained in the U.S. for a time longer than permitted.  In a hearing before the IJ,

---

[1] On 25 November 2002, President Bush signed the Homeland Security Act of 2002, Pub.L. No. 107-296, 116 Stat. 2125 (2002), which created a new Department of Homeland Security ("DHS"), abolished the INS, and transferred the INS's functions to the new department.

Garcia conceded removability and renewed her application for asylum and withholding of removal; she also claimed relief under the CAT.

Garcia submitted evidence that the ELN, a Marxist insurgent group operating in certain areas of Colombia, often raised revenue to support their cause by demanding a "war tax" from wealthy people living in the area of Colombia where her family's cattle farm–for which she assumed responsibility in mid-2000-- was located. The ELN is known to steal and destroy property, as well as to kidnap and kill people, for failure to pay the war tax or a ransom demanded. Garcia indicated that her own uncle and a close friend and neighbor had been kidnapped by the ELN.

The record shows that, after Garcia took over her family's cattle operation, the ELN demanded that she pay them a large sum of money, which she refused to do. She also attempted to organize neighboring ranchers to join her efforts in improving regional security. At one point, she requested assistance from the GAULA Organization, an anti-kidnapping task force set up by the Colombian police and military. Garcia testified that, beginning in 2000, she began receiving phone calls from ELN members threatening her and her family's lives for her refusal to pay the war tax and her efforts to improve regional security by requesting military assistance. On 27 August 2001, arsonists set fire to a barn

3

housing cattle located near the family's home while Garcia was present with her uncle. During the disturbance, she heard gunshots and people moving near the house. Shortly after the incident, ELN guerillas called Garcia, stating that the fire was intended to show her what happened to people who refused to pay the war tax.

The day after the fire, Garcia left the ranch to stay with her parents and sister in Barranquillo, Colombia. She then traveled to Jamaica on vacation and later decided to continue to the U.S. After arriving in the U.S., she contacted her family and learned that the situation around the ranch had not improved. She also learned that a close friend and neighbor was captured by the ELN and released only when ransomed. She testified that she feared that the same fate awaited her back in Colombia, stating that conditions in Colombia remain "terrible."

Although the IJ found Garcia's testimony credible and accepted that she had a legitimate fear of returning to Colombia, he denied her claims for relief and ordered her removal. The IJ found that the ELN threatened Garcia because she refused to pay the war tax, not because of a protected ground. The IJ specifically concluded that Garcia failed to show that the "ELN attribut[ed] any type of political opinion to [her] by virtue of [her] failure to pay the taxes," and also stated that "[t]he mere refusal to provide monies to the . . . guerillas does not necessarily mean that [Garcia was] being singled out by them as a supporter of the

4

government." In addition, the IJ rejected Garcia's claim of persecution on account of her membership in a particular social group, noting that the lack of evidence showing that her family–who has continued to operate the farm–has been threatened since her departure "indicate[s] that the guerrillas are not interested in them as a particular social group but were only interested earlier in . . . obtain[ing] money from individuals that they thought were able to pay." Finally, the IJ determined that Garcia was ineligible for protection under the CAT because she failed to show that she was the victim of past torture by the Colombian government or by persons acting with the consent or acquiescence of the Colombian government. On appeal, the BIA adopted and affirmed the IJ's order without an opinion.

## II. STANDARD OF REVIEW

In cases of express adoption of the IJ's decision, we review the IJ's decision as if it were the BIA's. Al Najjar v. Ashcroft, 257 F.3d 1252, 1284 (11th Cir. 2001). We review the IJ's factual determinations on Garcia's claims under the substantial evidence standard and, therefore, must uphold such findings if they are "supported by reasonable, substantial, and probative evidence on the record as a

5

whole." INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992). In other words, we will "affirm the IJ's decision unless the evidence 'compels' a reasonable fact finder to find otherwise." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230 (11th Cir. 2005) (quoting Elias, 502 U.S. at 481 n.1, 112 S.Ct. at 815 n.1). We review the IJ's legal conclusions de novo, but will defer to his interpretation of the INA if it is reasonable. Brooks v. Ashcroft, 283 F.3d 1268, 1272 (11th Cir. 2002).

## III. DISCUSSION

Garcia argues that the IJ erred in concluding that she failed to establish a nexus between her past persecution or well-founded fear of future persecution and her membership in a particular social group or imputed political opinion. She asserts that the IJ erroneously failed to recognize that she was threatened because she was a member of the educated, landowning class of cattle farmers regularly targeted by guerrillas in Colombia, which the Seventh Circuit has found to be a protected group for purposes of asylum. See Orejuela v. Gonzales, 423 F.3d 666, 673 (7th Cir. 2005). She also contends that the record shows that the ELN may have construed her acts as a disapproval of their efforts and goals and that this

6

evidence sufficiently establishes persecution because of an imputed political opinion. And, Garcia argues that the IJ abused his discretion by denying her relief under the CAT. We cannot agree, and we address each of Garcia's claims in turn.

## A. Asylum under INA § 208

Section 208 of the INA, 8 U.S.C. § 1158, vests DHS and the Attorney General with discretion to grant asylum to "refugees," or persons who are unable or unwilling to return to their country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, or membership in a particular social group, or political opinion." INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). An asylum applicant must demonstrate–by credible and specific evidence--either (1) past persecution on account of a statutorily listed factor, or (2) a well-founded fear that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). An applicant may establish a "well-founded fear" of future persecution by demonstrating these things: (1) she fears persecution based on an enumerated ground; (2) there is a reasonable possibility that she will suffer persecution if removed to her native country; (3) she is unable or unwilling to return to her native

country because of her fear; and (4) her fear of persecution is subjectively genuine and objectively reasonable. See 8 C.F.R. § 208.13(b)(2)(i); Al Najjar, 257 F.3d at 1289. In considering an asylum application, the IJ should consider whether the applicant could avoid persecution by relocating to another area within her native country. 8 C.F R. § 208.13(b)(3).

Substantial evidence supports the IJ's determination that Garcia was not persecuted and does not fear future persecution "on account of" her membership in a particular social group. In reaching this conclusion, we find it unnecessary to decide whether educated, landowning cattle ranchers in Colombia–the relevant social group as defined by Garcia–is a protected group, although we note that at least two other circuits have said that prominent landowners may constitute a protected class within Colombia. See Orejuela v. Gonzales, 423 F.3d 666, 672 (7th Cir. 2005) (granting asylum to Colombian family which fell "into a distinct social group: the educated, landowning class of cattle farmers targeted by FARC," another communist guerrilla group operating in Colombia); Ramirez v. Att'y Gen., No. 05-2640, 2006 WL 1911036, at *2 (3rd Cir. July 11, 2006) (unpublished) (noting that targeting of asylum applicant by FARC "because of his status as a businessman and landowner . . . could constitute the type of 'immutable characteristic' that would make up a 'particular social group' under the BIA's

8

definition of that term"). Although these decisions are not binding on this Court, they are instructive and are not inconsistent with our conclusion. In both Orejuela and Ramirez, the guerrillas specifically communicated that their threats and demands were made on the aliens because they were educated and landowners. See Orejuela, 423 F.3d at 672 (noting that one family member "was told by the FARC guerillas that [the threats were] because his family belonged to a 'privileged group' and that he and his brothers had gone to schools and universities; . . . [and] because his father was 'renowned' as a cattle rancher"); Ramirez, 2006 WL 1911036, at *1 (referring to a letter from FARC demanding money from applicant that stated, "We are aware that your properties and businesses are located in our areas of operations. Because of this, it is necessary to undertake some form of collaboration . . . .").

But, in this case, the specific evidence Garcia presented does not indicate that the ELN targeted her–or will do so in the future--because she was an educated landowner; the reason given for the ELN's threats was her refusal to pay the war tax. As noted by the IJ, the lack of evidence showing that her family has been harmed or threatened since she left Colombia supports this finding. Nothing in the record compels the conclusion that the ELN targeted her for a reason other than her perceived ability to pay the tax. As noted by the Seventh Circuit, a group defined

9

solely by their wealth is insufficiently narrow to constitute a protected class for asylum purposes. Orejuela, 423 F.3d at 672 (citing In re V-T-S, 21 I.&N. Dec. 792, 799 (BIA 1997)). Thus, the IJ did not err by rejecting Garcia's asylum claim based on her membership in a particular social group.

Substantial evidence also supports the IJ's determination that Garcia failed to show that the ELN persecuted her or that she fears future persecution because of her political opinion. To qualify for asylum based on the political opinion ground, an applicant must show " 'persecution on account of the victim's political opinion, not the persecutors.' " Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437-38 (11th Cir. 2004) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 482, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992)). Although a political opinion may be mistakenly "imputed" to the applicant by the persecutor, see Al Najjar v. Ashcroft, 257 F.3d 1262, 1289 (11th Cir. 2001), there must be some evidence that politics, rather than other likely reasons, motivated the alien's resistance to the persecutor. Elias-Zacarias, 502 U.S. at 482, 112 S.Ct. at 815-16. Here, Garcia's testimony that she reported ELN activity to an anti-kidnapping group and attempted to improve regional security is consistent with her imputed political claim, but such evidence does not compel this Court to conclude that the IJ erred.

10

Garcia introduced no specific evidence showing that her refusal to pay the war tax and other efforts against the ELN stemmed in part from a political opinion or that the ELN ever attributed a political opinion to her based on her acts. As we have previously determined, refusal to cooperate with or to support guerillas financially is insufficient to show persecution on account of a political opinion. Sanchez, 392 F.3d at 438; see also Elias-Zacarias, 502 U.S. at 482, 112 S.Ct. at 815-16 (guerilla organization's efforts to recruit alien into its military forces did not constitute persecution on account of a political opinion, and resistence to recruitment did not show, in itself, political motive on the alien's part). The evidence suggests that the ELN will persecute Garcia because of her refusal to pay a war tax. This persecution does not compel a finding of persecution on account of a political opinion; we therefore affirm the IJ's denial of asylum.

### B. Withholding of Removal under INA § 241

Section 241(b)(3)(A) of the INA, 8 U.S.C. § 1231(b)(3)(A), entitles an alien to withholding of removal if she can show that her "life or freedom would be threatened" on account of an enumerated ground. To meet this standard, an applicant must show that it is "more likely than not" she will be persecuted or

tortured upon return to her country.  Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1232 (11th Cir. 2005).  Because the standard for withholding of removal is more stringent than the "well-founded fear" standard for establishing asylum, failure to qualify for asylum generally forecloses eligibility for withholding of removal.  Al Najjar v. Ashcroft, 257 F.3d 1262, 1292-93 (11th Cir. 2001).  Because Garcia failed to establish her eligibility for asylum, the IJ correctly denied her application for withholding of removal under INA § 241(b)(3).

## C.  Withholding of Removal under the CAT

To obtain withholding of removal under the CAT, an applicant must show that it is "more likely than not" that she will be tortured in the country of removal. 8 C.F.R. § 208.16(c)(2).  For purposes of CAT relief, "torture" refers to "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  Id. § 208.18(a)(1).  Acquiescence of a public official "requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such

12

activity." Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1242 (11th Cir. 2004) (quoting 8 C.F.R. § 208.18(a)(7)).  Garcia did not claim potential torture on the part of the Colombian government or its agents, nor did she provide evidence that the Colombian government has or will breach its legal responsibility to intervene in or prevent the ELN's activities.  Thus, the IJ correctly determined that her claim for withholding of removal under the CAT must fail.

## IV.  CONCLUSION

We are guided by Elias-Zacarias and Sanchez, the factual weakness of the record, and the standard of review.  Substantial evidence supports the IJ's finding that Garcia is ineligible for asylum because she failed to establish a nexus between her past persecution or well-founded fear of future persecution and her membership in a particular social group or a political opinion.  The record sufficiently supports the IJ's conclusion that the ELN targeted Garcia because she refused to pay a war tax, not because she belonged to a particular social group or because of her political opinion, actual or imputed.  Although Garcia provided some support for her position, her evidence does not compel us to conclude the IJ erred.  In addition, Garcia failed to establish eligibility for withholding of removal

13

pursuant to the INA and the CAT.  Accordingly, Garcia's petition for review of the

removal order is

DENIED.

BARKETT, Circuit Judge, dissenting:

The only question before us in this case is whether the attacks and harassment Garcia suffered at the hands of the National Liberation Army ("ELN") were "on account of" a statutorily protected ground.[1] There are five such protected grounds: race, religion, nationality, or membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). Here, Garcia alleges that she was persecuted on account of her membership in a particular social group—the elite, landowning cattle ranchers targeted by Marxist groups such as the ELN—and her political opinion, which opposed the ELN's methods and goals.

I believe the majority erroneously characterizes the harrassment and attacks that Garcia suffered as nothing more than attempted extortion by the ELN. This reading is belied by the record evidence, and ignores the political and social import of the guerrillas' demands. Indeed, the majority's approach essentially transforms Colombia's political and social violence into nothing more than an extended crime wave, despite the fact that the IJ himself characterized it as 40-year-long "civil war" between the government and guerrillas. The latter characterization accurately captures the reality of the situation in Colombia, because it acknowledges that

---

[1] The majority erroneously refers to "the IJ's determination that Garcia was not persecuted." The IJ made no such determination. Because it dismissed Garcia's petition by finding no nexus between the mistreatment she suffered and any protected ground, the IJ did not consider whether that mistreatment amounted to "persecution." It did, however, find Garcia to be a credible witness.

Colombian guerrilla forces such as the ELN seek not just profit, but political control. Individuals caught in the middle of the struggle, as Garcia was, often find themselves the victims of political violence, not just crime. Indeed, according to one former Colombian judge, Colombia's current conflict "has its roots in political violence that has existed not far below the surface of Colombian society since the nation's founding in the 1820s." Luz E. Nagle, Colombian Asylum Seekers: What Practitioners Should Know About the Colombian Crisis, 18 Geo. Immigr. L.J. 441, 443-44 (2004) (emphasis added). The country's political volatility has always tracked the fault lines between the Conservative Party—which tends to represent landowners, the urban elite, and rural patrician families—and the Liberal Party, which generally represents leftists, laborers, and much of the rural peasantry.[2] Id. at 444.

From this simmering cauldron, Colombia's two major guerrilla groups—the ELN and the Revolutionary Armed Forces of Colombia ("FARC")—emerged in the 1960s as the radicalized leftist by-products of a ten-year de facto civil war between liberals and conservatives known as La Violencia. José E. Arvelo, Note, International Law and Conflict Resolution in Colombia: Balancing Peace and

---

[2] Sixty percent of Colombians live in poverty, while less than one percent of the population – generally the large landowners affiliated with the Conservative Party – owns the majority of the land. Luz E. Nagle, Colombia's Legal War Against Illegal Armed Groups, 15 Transnat'l L. & Contemp. Probs. 5, 10 (2005).

Justice in the Paramilitary Demobilization Process, 37 <u>Geo. J. Int'l L.</u> 411, 416 (2006). The FARC and ELN both claim to represent the rural poor against Colombia's wealthy classes and oppose American influence in Colombia, the privatization of natural resources, and multinational corporations. In order to advance their political goals, they have struggled to seize power from—and in some areas effectively replace—the precarious national government. William D. Shingleton, <u>Understanding Colombia</u>, 25 <u>Fletcher F. World Aff</u>. 255, 260 (2001).

The ELN was founded in 1963 by "Catholic radicals and left-wing intellectuals hoping to emulate Fidel Castro's communist revolution in Cuba." Counsel on Foreign Relations, <u>FARC, ELN, AUC (Colombia, Rebels)</u> (Nov. 2005), <u>available at</u> http://www.cfr.org/publication/9272/. It has been called Colombia's "only guerrilla group with a *bona fide* Marxist pedigree." Nagle, <u>Colombian Asylum Seekers</u>, at 450. In keeping with its leftist origins, the group's "main issue has been traditionally the exploitation of the country's natural resources, especially its petroleum reserves by state companies and foreign multinationals." Arturo Carrillo-Suarez, <u>Hors de Logique: Contemporary Issues in International Humanitarian Law as Applied to Internal Armed Conflict</u>, 15 <u>Am. U. Int'l L. Rev.</u> 1, 1 (1999). In recent years, however, the ELN has also made demands for "more general political and economic reforms, in addition to the nationalization of natural resources." <u>Id</u>. at 16 (internal citation omitted).

17

In order to achieve their political ends, the FARC and ELN have increasingly embraced a campaign of countrywide violence and crime. As the IJ noted, the "guerrillas operatives finance their operations" in Colombia's "civil war" through "not only drug trafficking but also through the extortion of funds from wealthy individuals in Colombia and through the payment of ransom for kidnaped victims." The guerrillas see these extortive "war taxes" (known as vacuna) as both a source of income and a political test, and often attack those who refuse to pay them, as Garcia learned firsthand. As the Third Circuit recently recognized, "[r]efusal or inability to pay these war taxes is viewed as an act of political opposition as often results in reprisal." Amaya Arias v. U.S. Att'y Gen., 143 Fed. Appx. 464, 465 (3d Cir. Aug. 2, 2005) (considering claims of a Colombian asylum seeker from Barranquilla). The ELN backs its demands with violence, particularly against landowners and the petroleum industries, both of which represent the foreign-dominated capitalism the group opposes.

Given the ideological bent of the ELN, it is not enough to say, as the IJ did here, that the guerrillas who targeted Garcia and her family were "not interested in them as a particular social group but were only interested to obtain money from individuals they thought were able to pay." To the contrary, Garcia and her family represent the very "social group" to which the ELN has been implacably and violently opposed for more than 40 years: the landowning elite. The majority

18

notes that "a group defined solely by their wealth is unsufficiently narrow to constitute a protected class for asylum purposes." Op. at page 9-10 (internal citations omitted). This may be true, but it is also irrelevant, because Garcia's social group was not defined "solely" by her wealth, but by the same factors—including "land ownership"—set out in the leading cases defining "particular social group" for the purposes of asylum. See, e.g., Matter of Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985).

Acosta is the leading BIA case defining "persecution on account of membership in a particular social group." It holds the phrase to mean "persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic" including "a shared past experience such as former military leadership or land ownership."(emphasis added).[3] Acosta, 19 I & N Dec. at 233. The Acosta definition of "social group" has been adopted by several Courts of Appeals. See, e.g., Lukwago v. Ashcroft, 329 F.3d 157, 171 (3d Cir. 2003); Lwin v. INS, 144 F.3d 505, 512 (7th Cir. 1998). Applying that definition to cases involving landowning Colombian cattle-ranchers,

---

[3]The Second and Ninth Circuits have adopted definitions which are even broader. See Gomez v. INS, 947 F.2d 660, 664 (2d Cir. 1991) (defining a "particular social group" as "individuals who possess some fundamental characteristic in common which serves to distinguish them in the eyes of the persecutor – or in the eyes of the outside world in general"); Hernandez-Montiel v. INS, 225 F.3d 1084, 1093 (9th Cir. 2000) (defining "particular social group" as one brought together either by voluntary association, including a former association, or by an innate characteristic so fundamental that its members either cannot or should not be required to change it).

our sister circuits have found them to constitute a "social group" that, in the Seventh Circuit's words, "is not defined merely by wealth ... but by their ownership of land, their social position as cattle farmers, and their education." Tapiero de Orejuela v. Gonzales, 423 F.3d 666, 672 (7th Cir. 2005) (granting asylum). The Third Circuit faced a similar issue in Ramirez v. Attorney General, 187 Fed. Appx. 228 (3d Cir. 2006). In that case, a Colombian businessman and landowner claimed to have been persecuted by the FARC based on his socio-economic class. As in Garcia's case, the IJ and BIA failed to reach Ramirez's social group claim, finding instead that he was targeted for purely "economic" reasons. Id. at *230. Noting the Seventh Circuit's opinion in Orijuela, the Third Circuit remanded to the BIA to consider whether Ramirez's status as a businessman and landowner made him part of a "social group" targeted by the FARC. Id. at *231; see also Ucelo-Gomez v. Gonzales, 448 F.3d 180, 187-88 (2d Cir. 2006) (remanding to the BIA for a determination whether "affluent Guatemalans" constitute "a particular social group"). I would follow the well-considered analysis of our sister circuits here.

The majority distinguishes Orejuela and Ramirez on the grounds that "[i]n both Orejuela and Ramirez, the guerrillas specifically communicated that their threats and demands were made on the aliens because they were educated and landowners." The threats and demands the majority quotes from those cases,

20

however, are no more specific than those that Garcia received. See Orejuela, 423 F.3d at 672 (noting that one family member "was told by the FARC guerillas that [the threats were] because his family belonged to a 'privileged group' and that he and his brothers had gone to schools and universities; . . . [and] because his father was 'renowned' as a cattle rancher"); Ramirez, 187 Fed. Appx. at 238 (referring to a letter from FARC demanding money from applicant that stated, "We are aware that your properties and businesses are located in our areas of operations.  Because of this, it is necessary to undertake some form of collaboration . . . ."). Here, the ELN told Garcia in July and August 2001 that she would pay the war tax with either money or blood, and that the payment was the cost "for being exploiters of the proletarian people of Colombia." Whether this threat evinced animus towards Garcia's position in the landowning capitalist elite (her social group) or a "political opinion" imputed to that group is immaterial, since Garcia claimed asylum on both grounds.

It seems that the ELN targeted the Garcias in part because they were affluent enough to pay the war tax. However, Garcia need not show that the persecution she suffered was "based solely on account of a protected ground" such as her social group or imputed political opinion. Garcia-Valderrama v. U.S. Att'y Gen, 130 Fed. Appx. 434, 436 (11th Cir. 2005) (reversing and remanding BIA determination that Colombian petitioner, who had been persecuted by FARC, suffered that

21

persecution at least in part on account of his political opinion). If an asylum applicant "can show that the persecution was, at least in part, motivated by a protected ground, then the applicant can establish eligibility for asylum." Id. In Colombia, which is wracked by violent divisions based on class, and where Marxist groups subscribe to a political ideology that is explicitly based on class, cattle-ranchers and landowners face socially and politically motivated violence as well as financial extortion.

Garcia also argues that she is entitled to asylum because she was persecuted on account of her political opinion. In denying Garcia's petition, the IJ relied on an erroneously narrow reading of "political opinion." The majority repeats that error. In INS v. Elias-Zacarias, the Supreme Court held that when an asylum applicant claims to have been persecuted due to a political opinion, the focus must be on the "victim's political opinion, not the persecutor's," and that resisting a guerrilla organization is not by itself proof of the resister's political opinion. 502 U.S. 478, 482, 483 (1992); see also Sanchez v. U.S. Att'y Gen, 392 F.3d 434, 438-39 (11th Cir. 2004) (citing Elias-Zacarias, 502 U.S. at 482). The Court found that an asylum-seeker must prove that he had a political opinion – or that one was imputed to him – and also a well-founded fear "that the guerrillas will persecute him because of that political opinion, rather than because of his refusal to fight with them." Id. at 483.

22

Elias-Zacarias does not, however, foreclose "political opinion" claims by petitioners whose actions demonstrate (even if just in the minds of their persecutors) both a political opinion and a desire to protect themselves. Reading the case otherwise would essentially require a petitioner to demonstrate that he or she was solely expressing a political opinion (which is a protected ground), without regard for personal safety (which is not). This is both illogical and contrary to our caselaw, which provides that asylum seekers need not show that the persecution they suffered was "based solely on account of a protected ground." Garcia-Valderrama, 130 Fed Appx. at 435. See also Borja v. INS, 175 F.3d 732, 735-36 (9th Cir. 1999) (en banc); Osorio v. INS, 18 F.3d 1017, 1028 (2d Cir. 1994) ("The plain meaning of the phrase 'persecution on account of the victim's political opinion,' does not mean persecution *solely* on account of the victim's political opinion.").

The petitioner in Elias-Zacarias failed to show that his actions were even partially motivated by his political opinion. Indeed, he testified to just the opposite: his sole reason for resisting the guerrillas was fear of retribution by the government. Elias-Zacarias, 502 U.S. at 482. Nor was there any evidence that the guerrillas imputed a political opinion to him based on his refusal to cooperate. Id. Unlike Elias-Zacarias, however, Garcia argues that she was targeted on account of both her expressed and her imputed political opinion. She first argues that the ELN

23

persecuted her because she explicitly expressed her political opposition to the group by refusing to give in to its demands, advocating for an increased military presence in the region, encouraging local cattle-ranchers to cooperate in the interests of self-protection, and reporting the ELN's threats to an anti-kidnaping organization.[4] The fact that Garcia simultaneously tried to protect herself and her family does not mean that her actions were not also a manifestation of her political beliefs. Indeed, asylum is designed to protect those whose safety is threatened on account of their political views. We undermine the purpose of those laws when we deny asylum to those whose political opinions happen to be aligned with their personal safety.

Moreover, as the majority correctly notes, "a political opinion may be mistakenly 'imputed' to the applicant by the persecutor." As we have recognized, "[a]n imputed political opinion, whether correctly or incorrectly attributed, may constitute a ground for a well-founded fear of political persecution within the meaning of the INA." Al Najjar, 257 F.3d at 1289 (quotation marks and citation omitted). The majority disregards the record evidence that the ELN imputed a political opinion to Garcia and persecuted her because of it. The record

---

[4] The majority acknowledges that Garcia's testimony was "consistent with her imputed political claim" but concludes that it "does not compel this Court to conclude that the IJ erred." Since this evidence, even under the majority's reading, demonstrates that the persecution Garcia suffered was, "at least in part, motivated by a protectected ground," Garcia-Valderrama, 130 Fed. Appx. at 436, I would regard the IJ's misreading as an error of law warranting reversal.

demonstrates that the ELN explicitly viewed opposition to the war tax as a political act, not simply a refusal to fund its activities. In the summer of 2001, just before Garcia fled Colombia, ELN agents told her that she would pay the tax with either money or blood, and that it was a payment for exploiting the proletarian people of Colombia. The guerrillas thus clearly characterized the war tax not simply as a means to obtain money, but as a political act in line with their professed Marxist revolutionary ideals. Indeed, as the Third Circuit recognized in a similar Colombian asylum case,"[r]efusal or inability to pay these war taxes is viewed as an act of political opposition and often results in reprisal." Amaya Arias, 143 Fed. Appx. at 465 (emphasis added). Landowners and cattle ranchers may of course be specially targeted on account of their wealth, but not solely because the ELN is motivated by criminal greed. Rather, their occupations and wealth make them representatives of a capitalist mindset – a "political opinion" – to which the ELN is avowedly and violently opposed.

The IJ, without determining whether the guerrillas' actions in this case amounted to persecution, found that any persecution Garcia suffered was not "on account of" a protected ground. By characterizing the attacks and threats as merely criminal in the face of record evidence to the contrary, the majority, like the IJ, abdicates the duty conduct the "case-by-case adjudication" required to determine whether Garcia has a "well-founded fear" of persecution. INS v. Cardoza-Fonseca,

25

480 U.S. 421, 448 (1987). Because I would find that the record compels the conclusion that Garcia was targeted based on two protected grounds – her membership in a social group and her political opinion – I respectfully dissent.