**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VICTOR HUGO TAPIA MADRIGAL,
                                   *Petitioner*,

            v.

ERIC H. HOLDER, JR., Attorney
General,
                                   *Respondent*.

No. 10-73700

Agency No.
A089-859-690

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
November 5, 2012—Seattle, Washington

Filed May 15, 2013

Before: William A. Fletcher and Raymond C. Fisher,
Circuit Judges, and Raymond J. Dearie, District Judge.[*]

Opinion by Judge Fisher

[*] The Honorable Raymond J. Dearie, Senior United States District Judge for the Eastern District of New York, sitting by designation.

**SUMMARY****

**Immigration**

The panel granted a petition for review of the Board of Immigration Appeals' decision denying asylum, withholding of removal, and protection under the Convention Against Torture to a citizen of Mexico who asserted claims based on his past military service and involvement in the arrest of several members of the Los Zetas drug cartel.

The panel held that the Board erred by concluding that the harm petitioner suffered, including attempts by unknown individuals to find him after he relocated, a drive-by shooting, and an anonymous threatening note, did not rise to the level of past persecution. The panel held that the Board erred by viewing these incidents in isolation, instead of examining the totality of the circumstances, and remanded for the Board to reconsider whether petitioner met his burden of establishing that Los Zetas were likely responsible for the incidents. The panel explained that if Los Zetas were responsible, then the record compels the conclusion that petitioner's membership in the particular social group of "former Mexican army soldiers who participated in anti-drug activity" was at least one central reason for his persecution.

The panel held that the Board erred by focusing only on the Mexican government's willingness to control Los Zetas, and remanded for the Board to consider in the first instance whether the Mexican government is able to control Los Zetas,

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and also whether a Mexican public official would likely acquiesce to any torture.

## COUNSEL

Theodore J. Angelis and John S. Wilson (argued), K&L Gates, LLP, Seattle, Washington, for Petitioner.

Tony West, Assistant Attorney General, Civil Division, Shelley R. Goad, Assistant Director, and Julia J. Tyler (argued), Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

## OPINION

FISHER, Circuit Judge:

Victor Hugo Tapia Madrigal, a former member of the Mexican military, petitions for review of a decision of the Board of Immigration Appeals (BIA) denying him asylum, withholding of removal and relief under the Convention Against Torture (CAT). Because the BIA's decision employed incorrect legal standards and rests on factual findings not supported by substantial evidence, we grant the petition for review and remand to the BIA.

## I. BACKGROUND

Tapia Madrigal is a native and citizen of Mexico. In a hearing before an immigration judge (IJ), Tapia Madrigal

testified that he joined the Mexican army in 2005 at age 18.[1] After basic training, he was assigned to a military base in the state of Jalisco, where he spent the next two-and-a-half years conducting anti-drug activities such as destroying marijuana and poppy flower crops. In mid-2007, 10 members of the Los Zetas drug cartel were arrested, including at least one high-ranking member. Tapia Madrigal was not involved in the arrest, but he assisted in transferring the arrestees from the small town where they were apprehended to civil authorities in Guadalajara. The transfer was broadcast on national television because of the importance of some of the arrestees. The national broadcast provided a clear view of Tapia Madrigal's face.

When Tapia Madrigal left his military base on authorized leave after the transfer of the arrestees, two men wearing masks kidnapped him while he was waiting for the bus not far from the base. The men covered his head, forced him into a truck and beat him with their fists, boots and heavy objects. They threatened to kill him because of his participation in transferring the arrestees, leading Tapia Madrigal to believe the men were members of Los Zetas. After 24 hours of beatings, the men released Tapia Madrigal with a message to convey: tell his commanding officer, Fortino Castillo León, that the 10 arrestees must be released or else all the people responsible for the arrest would be killed. Tapia Madrigal conveyed the message to Commander León, who did not believe the story and did not release the arrestees.

---

[1] The IJ found Tapia Madrigal to be a credible witness. We therefore assume that his testimony, as set forth in declarations and live testimony before the IJ, was true. *See Kalubi v. Ashcroft*, 364 F.3d 1134, 1137 (9th Cir. 2004).

After a day off to recover from his injuries, Tapia Madrigal was sent on a three-month mission to destroy marijuana crops. When he returned to the base, he learned that all the soldiers who had arrested the 10 members of Los Zetas had been beheaded while on leave. Fearing for his safety, Tapia Madrigal decided to leave the army. He went to his family's home for a few months, but after learning that Commander León had also been killed, he discreetly moved to a small town. Whenever someone asked Tapia Madrigal's family members where he was, his family members would lie about his whereabouts. Some of the people who asked about his current location were strangers, and Tapia Madrigal believes these strangers were affiliates of Los Zetas who were trying to find him.

Four or five months later, unknown individuals shot at Tapia Madrigal from a passing car while he was walking down the street in his new town. No one else was in the vicinity, so Tapia Madrigal felt sure the bullets were intended for him. He dropped to the ground to avoid the bullets and escaped harm. The car sped up and drove away quickly. Tapia Madrigal testified that he had not made any enemies in his new town and that he knew of no one who wished him harm besides members of Los Zetas. After this experience, he decided to leave Mexico.

After he moved to the United States in 2008, an anonymous letter was left at Tapia Madrigal's mother's house in Mexico. The letter, which was written by pasting together letters of different sizes and fonts that had been cut from other published materials, threatened Tapia Madrigal's life and stated that he had been located. After his mother and one of his sisters read the letter, his mother tore up the letter in her distress.

The government initiated removal proceedings against Tapia Madrigal in 2009.  Tapia Madrigal conceded removability, but sought asylum, withholding of removal and CAT relief.  The IJ determined Tapia Madrigal was ineligible for all forms of requested relief, and the BIA dismissed his appeal.  Tapia Madrigal petitions for review.

## II.  STANDARD OF REVIEW

We review for substantial evidence the factual findings supporting the BIA's decision that an applicant has not established eligibility for asylum, *see Yan Xia Zhu v. Mukasey*, 537 F.3d 1034, 1038 (9th Cir. 2008), withholding of removal, *see Pagayon v. Holder*, 675 F.3d 1182, 1190 (9th Cir. 2011), or relief under CAT, *see Li Chen Zheng v. Ashcroft*, 332 F.3d 1186, 1193 (9th Cir. 2003).  We review questions of law de novo.  *See Yan Xia Zhu*, 537 F.3d at 1038.

## III.  ASYLUM

To establish asylum eligibility, an applicant must show that he is unable or unwilling to return to his country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see also* 8 U.S.C. § 1158(b)(1)(A). "Either past persecution or a well-founded fear of future persecution provides eligibility for a discretionary grant of asylum." *Baghdasaryan v. Holder*, 592 F.3d 1018, 1023 (9th Cir. 2010) (quoting *Ratnam v. INS*, 154 F.3d 990, 994 (9th Cir. 1998)).  Tapia Madrigal claims eligibility for asylum based on both past persecution and fear of future persecution.

### A.  PAST PERSECUTION

"An applicant alleging past persecution has the burden of establishing that (1) his treatment rises to the level of persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by the government, or by forces that the government was unable or unwilling to control." *Id*.  Tapia Madrigal contends that (1) the kidnapping, beatings, death threats, inquiries regarding his whereabouts, drive-by shooting and threatening note rise to the level of persecution; (2) this persecution was on account of an imputed political opinion and on account of his membership in the particular social group of former Mexican army soldiers who participated in anti-drug activity; and (3) the Mexican government is unable or unwilling to control Los Zetas.

The BIA's conclusion that Tapia Madrigal was not persecuted "on account of" an imputed political opinion is supported by substantial evidence.  Nothing in the record suggests that members of Los Zetas believed Tapia Madrigal held a political belief contrary to their own.  For the reasons expressed below, however, his claim that he was persecuted on account of his membership in a particular social group might be meritorious.  We therefore remand this claim for further proceedings.

### 1.  Degree of Harm

Tapia Madrigal bases his past persecution argument partially on the mistreatment he endured while in the military and partially on events that occurred after he left the military. The BIA correctly concluded that mistreatment suffered while Tapia Madrigal was in the army cannot support his

claim of past persecution on account of a particular social group because he was not a *former* soldier at that time and his particular social group is comprised of only former soldiers. Mistreatment suffered while an applicant was an active military member does not by itself provide a basis for asylum because active duty members of the military do not constitute a social group. *See Cruz-Navarro v. INS*, 232 F.3d 1024, 1029 (9th Cir. 2000) ("Persecution occurring because a person is a current member of . . . the military . . . is not on account of one of the grounds enumerated in the Act." (internal quotation marks omitted)); *Matter of Fuentes*, 19 I & N Dec. 658, 661 (BIA 1988) (holding that the dangers faced by soldiers "as a result of that status alone are not ones faced on account of race, religion, nationality, membership in a particular social group, or political opinion"); *see also Chanco v. INS*, 82 F.3d 298, 302 (9th Cir. 1996). However, "[o]ur cases have . . . drawn a distinction between *current* and *former* military or police service when determining the scope of a cognizable social group under the INA." *Cruz-Navarro*, 232 F.3d at 1029. Thus, Tapia Madrigal cannot establish past persecution arising from his time in the army. We nonetheless consider these incidents to the extent they inform our analysis of the mistreatment he suffered after leaving the military.

Tapia Madrigal points to three incidents that occurred after he left the military to help establish his claim of past persecution: the attempts of unknown individuals to find him after he relocated, the drive-by shooting and the anonymous threatening note (collectively, "post-military incidents"). The BIA's conclusion that these incidents, which include an attempt to murder Tapia Madrigal, do not rise to the level of past persecution is contrary to our precedent. *See Lopez v. Ashcroft*, 366 F.3d 799, 803 (9th Cir. 2004) ("[A]ssaults

threatening life itself constitute persecution."). If the post-military incidents – certainly the murder attempt – are attributable to Los Zetas, then the cartel subjected Tapia Madrigal to mistreatment severe enough to provide a basis for asylum eligibility, assuming the other necessary factors are also present.[2]

The BIA discounted the post-military incidents because, in its view, "no evidence" supports Tapia Madrigal's belief that Los Zetas were responsible. The BIA appears to have reached this conclusion by viewing each incident in isolation, instead of examining the totality of the circumstances. This was error because the post-military incidents took place in the context of a larger pattern of conduct. First, Tapia Madrigal was kidnapped, detained, beaten and threatened with death for his role in transporting arrestees who were members of Los Zetas. Second, the soldiers who actually arrested those cartel members were beheaded. Third, Tapia Madrigal's commanding officer was killed. Fourth, after Tapia Madrigal tried to quietly relocate, unknown individuals inquired regarding his whereabouts. Fifth, he was shot at on the street from a passing car. Sixth, his family received an anonymous threatening note.

---

[2] The BIA held that, even considering the kidnapping, detention and beatings Tapia Madrigal endured while he was in the army, the mistreatment he suffered was not severe enough to constitute persecution. In light of the significant circuit authority to the contrary, *see, e.g.*, *Lopez*, 366 F.3d at 803 (murder attempts constitute persecution); *Fedunyak v. Gonzales*, 477 F.3d 1126, 1129 (9th Cir. 2007) (beatings and death threats constitute persecution); *Tarubac v. INS*, 182 F.3d 1114, 1118 n.2 (9th Cir. 1999) (kidnapping, beatings and threats constitute persecution), the government on appeal explicitly decided not to defend this part of the BIA's ruling.

Viewed in context, Tapia Madrigal's belief that the three post-military incidents are attributable to Los Zetas is more than pure speculation. The course of conduct and surrounding circumstances provide circumstantial evidence that Los Zetas were the ones who inquired about his whereabouts, shot at him on the street and sent the threatening note. Although it is Tapia Madrigal's burden to establish his eligibility for asylum, he may satisfy this burden with circumstantial evidence. *See Singh v. Gonzales*, 439 F.3d 1100, 1111 (9th Cir. 2006); *Bhasin v. Gonzales*, 423 F.3d 977, 984 (9th Cir. 2005). Because his explanation for the post-military events is plausible and supported by circumstantial evidence, it must be credited in the absence of an explanation that is at least as plausible. *See Navas v. INS*, 217 F.3d 646, 657 (9th Cir. 2000) ("[T]his court has held persecution to be on account of political opinion where there appears to be no other logical reason for the persecution at issue."); *see also Li v. Holder*, 559 F.3d 1096, 1112 (9th Cir. 2009) (inferring that the asylum applicant's mistreatment was on account of his political opinion in the absence of any other logical explanation); *Navas*, 217 F.3d at 656–57, 660–61 (same); *Hernandez-Ortiz v. INS*, 777 F.2d 509, 516–17 (9th Cir. 1985) (same), *superseded by statute on other grounds as stated in Parussimova v. Mukasey*, 555 F.3d 734, 739–40 (9th Cir. 2009).

We therefore remand for the BIA to determine whether other plausible explanations for the post-military incidents exist and, if so, whether Tapia Madrigal has met his burden to establish that Los Zetas are likely responsible. If the BIA finds that Los Zetas are likely responsible for the murder attempt, an extremely serious incident, that would be sufficient to show persecution. *See Lopez*, 366 F.3d at 803. Unlike the shooting, the other two post-military incidents are

not individually severe enough to constitute past persecution, but viewed as part of a course of conduct, could justify or reinforce a finding of persecution if traceable to Los Zetas.

## 2. Causal Nexus

The BIA concluded that the lack of a nexus between the persecution Tapia Madrigal suffered and a protected ground precludes a grant of asylum. We agree that Tapia Madrigal has not established a nexus between his persecution and an imputed political opinion. However, if Tapia Madrigal can establish that Los Zetas are responsible for his post-military persecution as discussed above, then the record compels the conclusion that such persecution was on the basis of his membership in the particular social group of "former Mexican army soldiers who participated in anti-drug activity."

The BIA acknowledged that Tapia Madrigal's social group has the requisite particularly and social visibility to be cognizable under the Immigration and Nationality Act. But the BIA concluded, without discussion, that he had not established a nexus between the "vague" post-military incidents and his membership in this social group. To the extent the BIA's conclusion rested on its view that Tapia Madrigal had not established Los Zetas as the source of these incidents, we have explained above why its reasoning is flawed. If the BIA meant that even if Los Zetas were involved there would be no nexus, that is not supported by the record. Assuming it was Los Zetas who continued to go after Tapia Madrigal after he left the military, the record shows that one central reason was his status as a former Mexican army soldier who had participated in anti-drug activity.

Tapia Madrigal had no trouble with Los Zetas before his face was broadcast transporting arrestees from the cartel to a different detention facility. After the broadcast, however, other members of Los Zetas kidnapped, beat and threatened him the next time he was on leave. From the kidnappers' communications and demands during the event, we know it was his participation in the transfer of the arrestees that prompted this abuse. If Los Zetas continued to pursue Tapia Madrigal even after he left the army, the record compels the conclusion that such mistreatment was motivated by the cartel's disapproval of his anti-drug activities and its hope to intimidate him and others like him.

The government contends that because Los Zetas' mistreatment of Tapia Madrigal after he left the military was "retribution" for actions he took while in the military, there is no nexus to his social group membership. Although mistreatment motivated purely by personal retribution will not give rise to a valid asylum claim, *see Ayala v. Holder*, 640 F.3d 1095, 1098 (9th Cir. 2011), if a retributory motive exists alongside a protected motive, an applicant need show only that a protected ground is "one central reason" for his persecution. 8 U.S.C. § 1158(b)(1)(B)(i).[3] For example, in *Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013) (en banc), we held that Salvadorans who testified in open court against drug cartels could constitute a particular social group,

---

[3] In *Ayala*, the asylum applicant was attacked and threatened by the very same drug dealers "he had personally arrested" while he was in the military. *Ayala*, 640 F.3d at 1096. We emphasized that it was the same individuals the applicant had targeted who later sought him out for revenge after he left the military. *See id.* at 1096, 1098. Here, in contrast, there is no suggestion that Tapia Madrigal's mistreatment has been or will be at the hands of the same members of Los Zetas he transferred. *Ayala*, a case of purely personal retribution, is not controlling.

and we faulted the BIA for "fail[ing] to consider significant evidence that Salvadoran society recognizes the unique vulnerability of people who testify against gang members in criminal proceedings, because gang members are likely to target these individuals as a group." *Id*. at 1092. Gang persecution of adverse witnesses would certainly have revenge as one motive, but group-based intimidation would be another. "[A]nti-cartel informants, who might not be recognizable on-sight as members of that group, would be socially visible – particularly to revenge-seeking cartel members – if their identity were discovered because they testified in court, as Henriquez-Rivas did here." *Id*. at 1088. In Tapia Madrigal's case, even if revenge partially motivated Los Zetas' mistreatment of him, the record makes clear that their desire to intimidate members of his social group was another central reason for the persecution.

### 3.  Willingness and Ability to Control Los Zetas

The BIA concluded that the Mexican government is willing and able to control Los Zetas, precluding Tapia Madrigal from obtaining asylum on any basis. This conclusion was the result of legal error: the BIA appears to have focused only on the Mexican government's willingness to control Los Zetas, not its *ability* to do so. The BIA cited various statistics on the efforts of the national Mexican government to combat drug violence, but it did not examine the efficacy of those efforts.

Significant evidence in the record calls into doubt the Mexican government's ability to control Los Zetas. The available country conditions evidence demonstrates that violent crime traceable to drug cartels remains high despite the Mexican government's efforts to quell it. According to

one State Department report, as a result of the Mexican government's increased pressure against narco-traffickers, "drug-related assassinations and kidnappings have reached unprecedented levels . . . including the deaths of 522 military and law enforcement officials" in 2008.  David T. Johnson, U.S. Dep't of State, Guns, Drugs and Violence: The Merida Initiative and the Challenge in Mexico (2009). Furthermore, notwithstanding the superior efforts of the Mexican government at the national level, corruption at the state and local levels "continue[s] to be a problem."  U.S. Dep't of State, 2008 Human Rights Report: Mexico (2009).  Many police officers are "involved in kidnapping, extortion, or providing protection for, or acting directly on behalf of, organized crime and drug traffickers," which leads to the "continued reluctance of many victims to file complaints."  *Id*.  Some of the successes cited in the BIA's opinion – such as the arrests during a seven-year period of "79,000 people on drug trafficking related charges" – may be of limited practical significance to Tapia Madrigal's situation, because corruption is also rampant among prison guards, and prisoners can and do break out of prison with the guards' help.  *See, e.g.*, Marc Lacey, *Mexico's Drug Traffickers Continue Trade in Prison*, N.Y. Times, Aug. 11, 2009.

Because the BIA appears to have considered only the Mexican government's willingness to control Los Zetas and not its ability to do so insofar as it might affect Tapia Madrigal's asylum application, we remand for the BIA to consider in the first instance whether the Mexican government is *able* to control Los Zetas.  *See INS v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002) (requiring remand when the BIA has not yet considered an issue); *Lopez v. Ashcroft*, 366 F.3d 799, 805–07 (9th Cir. 2004) (remanding the case to the BIA where the BIA's decision was based on erroneous

legal standards); *Pannu v. Holder*, 639 F.3d 1225, 1229 (9th Cir. 2011) (same).

\*\*\*

We therefore grant the petition with respect to Tapia Madrigal's past persecution claim and remand to the BIA. On remand, the BIA must determine whether the post-military incidents are attributable to Los Zetas and whether the Mexican government is able to control Los Zetas as relevant to those in Tapia Madrigal's particular social group. If the BIA determines both that Los Zetas are likely responsible for the drive-by shooting – a logical conclusion in this context if no other plausible explanation is proffered – and that Mexico was unable to control Los Zetas, then Tapia Madrigal is eligible for asylum, because a murder attempt rises to the level of persecution and his membership in the relevant social group is one central reason for the persecution.

## B.  FUTURE PERSECUTION

The BIA disposed of Tapia Madrigal's claim of a well-founded fear of future persecution by concluding that the Mexican government is willing and able to control Los Zetas. As discussed above, the BIA did not sufficiently consider Mexico's *ability* to control Los Zetas, so we grant the petition and remand for further proceedings on Tapia Madrigal's claim of future persecution.

Even if the BIA determines that Tapia Madrigal has not suffered past persecution because the drive-by shooting is not attributable to Los Zetas, it must still consider whether he is likely to suffer future mistreatment at the hands of Los Zetas

severe enough to give rise to an asylum claim. The BIA should consider the kidnapping Tapia Madrigal endured while he was in the military, the fates of his fellow soldiers, any post-military incidents the BIA determines are attributable to Los Zetas and any country conditions evidence describing how Los Zetas treat former soldiers who participated in anti-drug activity.[4]  If the BIA concludes that the Mexican government cannot control Los Zetas and that Tapia Madrigal has a well-founded fear of severe mistreatment at their hands, then he is eligible for asylum because a causal nexus would necessarily exist between that mistreatment and his membership in a particular social group, as discussed above.

## IV.  WITHHOLDING OF REMOVAL

An applicant is entitled to withholding of removal if his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(A).  The BIA denied withholding of removal based on the Mexican government's willingness and ability to control Los Zetas and based on the lack of a nexus between any past or future persecution and a protected ground. Because we reject the BIA's finding on the lack of a causal nexus and remand on the issue of the government's ability to control Los Zetas, we also grant the petition on this claim and

---

[4] If attributable to Los Zetas, even those post-military incidents that do not standing alone rise to the level of persecution – the inquiries about his location and the anonymous note – could provide evidence that Los Zetas have "marked" Tapia Madrigal and would continue to seek him out for abuse if returned to Mexico.

remand to the BIA to reconsider Tapia Madrigal's application for withholding of removal.

## V.  CONVENTION AGAINST TORTURE

An applicant is eligible for CAT relief if he establishes that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2).  Torture is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."  8 C.F.R. § 208.18(a)(1).  Thus, a CAT applicant must show both a greater than 50 percent likelihood that he will be tortured, *see Cole v. Holder*, 659 F.3d 762, 770 (9th Cir. 2011), and that a public official would inflict, instigate, consent to or acquiesce in that torture, *see* 8 C.F.R. § 208.18(a)(1).

## A.  LIKELIHOOD OF TORTURE

Under CAT's implementing regulations, the BIA must consider all evidence of country conditions to determine the likelihood that an applicant would be tortured.  *See* 8 C.F.R. § 1208.16(c)(3) ("In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, *all* evidence relevant to the possibility of future torture *shall* be considered, including, but not limited to: . . . (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and (iv) Other relevant information regarding conditions in the country of removal." (emphases added)); *see also Cole*, 659 F.3d at 771–72 ("[W]here there is any

indication that the BIA did not consider all of the evidence before it, a catchall phrase [stating that the BIA considered all the evidence] does not suffice, and the decision cannot stand."); *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705–06 (9th Cir. 2010) (remanding a CAT claim where the BIA and the IJ failed to consider a portion of the country condition evidence).

It appears the BIA did not consider all the country condition evidence Tapia Madrigal properly placed before it. The BIA faulted Tapia Madrigal for appending to his appellate brief "new" country conditions evidence that he had not presented to the IJ, stating that it would not consider this "new" material.  In fact, none of the country condition evidence was new; all of it had been presented to the IJ. Given the high likelihood that the BIA did not consider all the country condition evidence properly before it, remand is appropriate.

On remand, the BIA must determine whether it is more likely than not that Tapia Madrigal would be tortured if removed to Mexico.  The BIA must consider all country condition evidence, the kidnapping that occurred while Tapia Madrigal was in the military, the fates of his fellow soldiers and any post-military incidents it determines are attributable to Los Zetas.  While relatively minor forms of abuse do not constitute torture, if the BIA determines that Tapia Madrigal is more likely than not to be murdered if returned to Mexico, that could constitute torture. *See Cole v. Holder*, 659 F.3d at 771 ("'Acts constituting torture' under CAT 'are varied, and include beatings and killings.'" (quoting *Bromfield v. Mukasey*, 543 F.3d 1071, 1079) (9th Cir. 2008))); *see also Comollari v. Ashcroft*, 378 F.3d 694, 697 (7th Cir. 2004) (Posner, J.).

## B. ACQUIESCENCE OF A PUBLIC OFFICIAL

Without analysis, the BIA concluded that any torture Tapia Madrigal is likely to suffer would not be with the consent or acquiescence of a public official. The BIA failed to "state with sufficient particularity and clarity the reasons for" this decision and so does not "provide an adequate basis for this court to conduct its review." *Castillo v. INS*, 951 F.2d 1117, 1121 (9th Cir. 1991). The inquiry about whether Mexican officials would acquiesce in torture is related to the inquiry in the asylum context of whether the Mexican government is not just willing but also able to control Los Zetas, at least insofar as it would affect Tapia Madrigal. Both require examining the efficacy of the government's efforts to stop the drug cartels' violence, and both are affected by the degree of corruption that exists in Mexico's government. Remand is therefore also appropriate for the BIA to consider whether a Mexican public official is likely to acquiesce in any torture Tapia Madrigal might suffer.

"Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7). Although the public official must have "awareness" of the torturous activity, he need not have actual knowledge of the specific incident of torture. *See Li Chen Zheng v. Ashcroft*, 332 F.3d 1186, 1194–96 (9th Cir. 2003). Acquiescence also does not require that the public official approve of the torture, even implicitly. *See id.* It is sufficient that the public official be aware that torture of the sort feared by the applicant occurs and remain willfully blind to it. *See id.*; *Aguilar-Ramos*, 594 F.3d at 705–06.

Importantly, an applicant for CAT relief need not show that the entire foreign government would consent to or acquiesce in his torture. He need show only that "a public official" would so acquiesce. 8 C.F.R. § 208.18(a)(1); *see Li Chen Zheng*, 332 F.3d at 1189–96 (remanding a CAT claim to the BIA where corrupt Chinese officials at the local level colluded with human smugglers, even though the national government "appears to be taking active measures to target people smugglers," *id*. at 1191). Voluminous evidence in the record explains that corruption of public officials in Mexico remains a problem, particularly at the state and local levels of government, with police officers and prison guards frequently working directly on behalf of drug cartels. Facing analogous facts, the Eighth Circuit held that eligibility for CAT relief

> does not require that the public official [who acquiesces in torture] be executing official state policy or that the public official be the nation's president or some other official at the upper echelons of power. . . . [I]t is not contrary to the purpose of the CAT . . . to hold Mexico responsible for the acts of its officials, including low-level ones, even when those officials act in contravention of the nation's will . . . .

*Ramirez-Peyro v. Holder*, 574 F.3d 893, 901 (8th Cir. 2009). We agree. If public officials at the state and local level in Mexico would acquiesce in any torture Tapia Madrigal is likely to suffer, this satisfies CAT's requirement that a public official acquiesce in the torture, even if the federal government in Mexico would not similarly acquiescence. We therefore remand for the BIA to consider whether any torture Tapia Madrigal is likely to endure if returned to Mexico

would be with the consent or acquiescence of a public official.

***

We grant Tapia Madrigal's petition with respect to his claim for social group based asylum – both past persecution and fear of future persecution – withholding of removal and CAT relief and remand to the BIA for further consideration consistent with this opinion. The panel retains jurisdiction for any subsequent appeals.

**PETITION GRANTED**.