**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EDGAR RENE CORDOBA,

*Petitioner*,

v.

ERIC H. HOLDER, JR., Attorney General,

*Respondent*.

No. 08-74384

Agency No.
A096-085-156

ANTONIO MEDINA GONZALEZ,

*Petitioner*,

v.

ERIC H. HOLDER, JR., Attorney General,

*Respondent*.

No. 10-73112

Agency No.
A022-997-885

OPINION

On Petitions for Review of Orders of the
Board of Immigration Appeals

Argued and Submitted
April 11, 2013—Pasadena, California

Filed August 13, 2013

Before: Stephen Reinhardt and Mary H. Murguia, Circuit
Judges, and Jack Zouhary, District Judge.*

Opinion by Judge Reinhardt;
Partial Concurrence and Partial Dissent by Judge Zouhary

## SUMMARY**

### Immigration

The panel granted the petitions for review of Edgar Rene
Cordoba and Antonio Medina-Gonzalez from the Board of
Immigration Appeals' decisions denying asylum and
withholding of removal on the grounds that their status as
landowners did not qualify as a particular social group within
the meaning of 8 U.S.C. § 1101(a)(42)(A).

The panel remanded for the BIA to reconsider in light of
this court's recent en banc decision in *Henriquez-Rivas v.
Holder*, 707 F.3d 1081 (9th Cir. 2013), on the question of
whether landownership may form the basis for membership
in a particular social group for purposes of eligibility for
asylum and withholding. The panel found that there were
clear inconsistencies between *Henriquez-Rivas* and the BIA's
decisions, which were decided before the en banc opinion
was published.

---

* The Honorable Jack Zouhary, United States District Judge for the
Northern District of Ohio, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

The panel also remanded for reconsideration of Medina-Gonzalez's CAT claim in light of *Tapia-Madrigal v. Holder*, 716 F.3d 499 (9th Cir. 2013), which found that a public official must be aware of the torturous activity but need not have actual knowledge of the specific incident of torture.

Judge Zouhary concurred in the judgment of the asylum claims, but wrote separately to clarify that remand is appropriate because the BIA decisions in these cases came down before the en banc opinion in *Henriquez-Rivas.* Judge Zouhary would remand to the BIA for the limited purpose of determining whether there was evidence that members of the proposed group would be perceived as a group by society. Judge Zouhary dissented from the section addressing Medina-Gonzalez's CAT claim. He would find that the BIA's denial of the claim was supported by substantial evidence and would affirm.

---

**COUNSEL**

*Cordoba v. Holder*, No. 08-74384

Susan E. Hill (argued), Hill, Piibe & Villegas, Los Angeles, California, for Petitioner.

Tony West, Assistant Attorney General, Civil Division, Stephen J. Flynn, Assistant Director, and Imran R. Zaidi (argued), Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

***Medina-Gonzalez v. Holder*, No. 10-73112**

Saad Ahmad (argued), Saad Ahmad & Associates, Fremont, California, for Petitioner.

Tony West, Assistant Attorney General, Civil Division, Melissa Neiman-Kelting, Assistant Director, Imran R. Zaidi (argued) and Ilissa Gould, Trial Attorneys, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

## OPINION

REINHARDT, Circuit Judge:

These cases, consolidated for purposes of disposition, both present the question of whether landownership may form the basis for membership in a particular social group for purposes of eligibility for asylum. Because the agency did not have the benefit of our recent en banc decision in *Henriquez-Rivas v. Holder* when it adjudicated petitioners' claims, we grant the petitions for review and remand for the BIA to reconsider its determinations.

## I.

The Attorney General may, in his discretion, grant asylum to applicants determined to be refugees within the meaning of the Immigration and Nationality Act ("INA"), INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). An individual qualifies as a refugee when he is "unable or unwilling to return to [his last country of residence] . . . because of persecution or a well-founded fear of persecution on account of race, religion,

nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A); *see Navas v. INS*, 217 F.3d 646, 654 (9th Cir. 2000). These cases involve two individuals whose asylum applications were denied because the BIA held that the particular social groups in which they claimed to be members did not qualify as "particular social group[s]" within the meaning of the statute.

## A.

Edgar Rene Cordoba, a native and citizen of Colombia, petitions for review of the decision of the Board of Immigration Appeals (BIA) denying his claims for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). Cordoba's primary claim is that he and his family were persecuted by the Revolutionary Armed Forces of Colombia (the "FARC"), because they are wealthy, educated landowners and businesspeople.

Cordoba was born into a family that had significant landholdings, including several family properties and farms, in and near Cali, Colombia, as well as some family businesses. Cordoba was educated in the United States and then returned to Colombia, where he inherited and ran the family business. According to Cordoba, whose testimony was deemed credible by the Immigration Judge (IJ), he was well-known in the area as the owner and principal manager of these properties and businesses, and his name appeared on the deeds to the properties and business licenses.

According to country conditions materials submitted by Cordoba, the FARC claims to represent the rural poor against Colombia's wealthy classes, and accordingly targets wealthy

landowners, foreigners, and people in political office. These materials document that the FARC is responsible for hundreds of kidnappings, hijackings, and other attacks on civilians each year, as well as numerous political assassinations.

Cordoba's testimony recounted numerous incidents, dating back to the 1990s, in which he and his family had been targeted by the FARC. In 1992, Cordoba's father was kidnapped by the FARC and held for approximately one month, until some friends arranged for his liberation by paying a ransom. Not long thereafter, Cordoba took over the family landholdings and businesses from his father. He relates that in the mid-1990s, members of the FARC intercepted trucks from Cordoba's transportation business and demanded payment in return for the trucks' safe passage through FARC-controlled territory. When Cordoba refused to comply, the FARC destroyed two of his company's trailers by rolling them down a mountain—leading Cordoba to shut down the transportation part of his business.

Cordoba's wife and children were the target of three separate confrontations in early 2001, two of which involved armed individuals. In January, his wife was driving in Cali when she was surrounded by individuals on two motorcycles and in a pickup truck. The individuals hit their pistols against her car windows in an attempt to scare her, and demanded that she pull over so that they could "take [her] for a drive." She was able to escape only by hitting the accelerator and speeding down the wrong side of the street—against traffic. Cordoba's wife called the police, but they did not come. The next month, his wife, driving the same car, was again followed by motorcycles after picking up her children from a well-known and prestigious school; she escaped by driving

her car into a ditch and fleeing on foot. In March, Cordoba's wife was attacked yet again, this time by two masked gunmen. They came up to the door of Cordoba's store, showed his wife their gun, and demanded entry. She grabbed a gun from behind the counter and exchanged gunfire with the two men. The gunmen eventually fled the scene. Cordoba's wife called the police, who responded to the scene and wrote up a report, but, to Cordoba's knowledge, there was no prosecution or further investigation of the incident.

One month later, individuals associated with the FARC began contacting Cordoba directly by regularly calling the business phone at the convenience store he owned. The individuals identified themselves as members of the FARC militia; as Cordoba testified, the callers stated that "[t]hey knew who I was and where I lived and where I worked, [and] where my kids went to school." They called him a "toad" (meaning "snitch"), and demanded money from him. Despite Cordoba's refusal of the callers' demands, they continued to call, to the point where Cordoba began instructing his employees not to answer the phone. Within a few days, Cordoba began receiving telephone calls at his home. In these calls, FARC members repeatedly called Cordoba a "toad," demanded financial contributions to their cause, and threatened that he would "pay the consequences of not contributing or assisting them." Cordoba began instructing his family not to answer the home phone. He and his family began regularly changing apartments in order to evade the FARC.

Having no faith in the ability of the police to protect him, Cordoba and his family fled to the United States on visitor visas in June 2001. They returned that December, believing that the FARC might no longer be targeting them. The

FARC, however, did not cease targeting Cordoba when he returned to Colombia. On December 17, 2001, as Cordoba and his father were driving up to one of their farms outside Cali (a citrus farm and poultry farm that supplied local supermarkets), they witnessed five "suspicious" men standing at the entrance to their farm, questioning the farm administrator. Cordoba and his father accordingly did not stop at the farm as they had intended. The administrator later told Cordoba that the men knew that the farm belonged to Cordoba and wanted to talk to him; the men also asked the administrator questions about Cordoba: "about my whereabouts, where they can get ahold of me and how . . . they can [r]each me." When Cordoba reported this incident to the unit of the Colombian police that handles kidnapping and extortion cases, he was advised that his farm was located in an area within the FARC's control, and that his story was similar to that of many individuals who were later kindnapped by the FARC. He was cautioned that he should not return to the farm "under any circumstances."

In January 2002, Cordoba received another phone call from the FARC—this time at his real estate and leasing office in Cali. The caller asked for Cordoba by name, and told him that he had been targeted to contribute to the FARC's cause, with an expected "contribution" of 200 million pesos (approximately $100,000). Cordoba instructed his secretary not to answer the phone and eventually disconnected his work number; he also decided to ask the local prosecutor's office to initiate a formal investigation. The officers advised him to leave the country, stating that they had many cases like his, that they could not handle them all, and that "[t]here's no protection. We can't offer you any protection." Cordoba, along with his wife and children, fled to the United States shortly thereafter.

Although, at the time of his hearing, Cordoba's parents remained in Colombia, his father did not frequently leave home. Cordoba's father submitted a letter stating that the family continued to receive telephone calls from strangers seeking Cordoba's current address. Further, on two different occasions, three men visited Cordoba's mother at her business, asking for Cordoba and threatening to kill him; these men also threatened to kidnap his mother in order to extort money from him. Cordoba testified that, since his departure, the family had been required to shut down some of the businesses they once operated, because they could find no one willing to risk running a business that had been targeted by the FARC. As Cordoba stated with regard to one of his businesses, "It was basically marked by the FARC. Nobody wanted to take [it]. We couldn't even rent the place because they knew what type of problem [we] had."

On September 5, 2002, Cordoba filed an application for asylum, withholding of removal, and CAT relief. In his asylum and withholding claims, Cordoba alleged, *inter alia*, that he had been persecuted on account of his membership in a particular social group consisting of wealthy, educated landowners and businesspeople. Subsequently, Cordoba was placed into removal proceedings and charged under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), as a non-immigrant visitor who had overstayed his visa. After a hearing before an IJ, at which Cordoba testified, he was deemed credible; nevertheless, his claims for relief were denied, and he was ordered removed.

The BIA affirmed the IJ's order in an unpublished, one-member decision. The BIA held that the social group proposed by Cordoba "does not constitute a particular social group for the purposes of the Act." The BIA explained that

the group Cordoba had identified was "not the type of group that is perceived by society as a group" and that it could not "be accurately described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." Cordoba timely filed a petition for review with this court.

### B.

Antonio Medina-Gonzalez, a native and citizen of Mexico, petitions for review of the BIA's decision denying his claims for asylum, withholding of removal, and CAT relief. Medina-Gonzalez claims that he was abducted and held for ransom by members of a Mexican drug cartel because of his status as a landowner.

Medina-Gonzalez was born into a well-known, upper-middle class family in the small town of Huanusco, Zacatecas. As Medina-Gonzalez testified, in Huanusco, "[e]verybody knows the Medina family." Three of his relatives (two uncles and a cousin) have served as mayors of Huanusco, and one served as a senator of Zacatecas. Medina-Gonzalez's great-grandfather was a prominent figure in Mexico who owned more than 5,000 acres of land, now divided among his descendants. Medina-Gonzalez, along with his brother, owns approximately 300 acres of this land near Huanusco, on which they raise cattle and operate an agave farm. Medina-Gonzalez took over operation of his family land in 1997, after his parents died, and he had continually managed his family's ranch up to the time of the incidents that form the basis of his asylum claim.

On December 17, 2008, Medina-Gonzalez was abducted while he was taking care of the horses on his grandfather's

nearby land. Several trucks and cars drove up to the property, and seven or eight men carrying rifles and hand guns surrounded him. Without offering an explanation, these men put a gun to Medina-Gonzalez's head and forced him into the back seat of a car, saying "if you don't cooperate with us, we're going to kill you." His adductors, who claimed to be members of the Zetas (a drug cartel in Mexico), drove him from Huanusco to the city of Zacatecas (within the state of the same name), approximately two-and-a-half hours away.

During the drive to Zacatecas, Medina-Gonzalez's abductors questioned him about his brother, Francisco, a U.S. citizen who lives in Novato, California. They repeatedly asked Medina-Gonzalez for his brother's telephone number; when he was unresponsive to their questions, he was hit "in the face, in the head . . . anywhere they could." Further, during this drive, Medina-Gonzalez testified that he witnessed the driver of the car stop twice at police check points. The driver spoke with men whom Medina-Gonzalez believed to be police officers and asked them "if everything was clear" before continuing to drive down the road. Medina-Gonzalez—who was not blindfolded during the ride— recalled that the men who assisted his captors wore police uniforms, including hats, and displayed police badges.

Upon arriving in Zacatecas, the abductors blindfolded Medina-Gonzalez, placed a plastic bag over his head, and took him into a house. He was held captive in the house for eight days—until December 24, 2008—during which he was subjected to extreme abuse. As Medina-Gonzalez put it, he was "treated like an animal." He was beaten repeatedly; *inter alia*, his captors would throw him on the floor and kick him, hitting him in the kidneys and on his feet. His captors also played "Russian roulette" with him and subjected him to

electric shocks, and he was forced to urinate and defecate in his own clothes. Further, Medina-Gonzalez testified that his captors sexually molested him—an experience he described as leaving him "humiliated" and "embarrassed." Medina-Gonzalez testified that when he was finally released, he couldn't walk, his body was covered with bruises, and he sought medical treatment. According to a report from the doctor who treated him, Medina-Gonzalez had "major bruising," "first-degree burns," "multiple blunt injuries all over his body," and a "likely fractured left rib cage."

Medina-Gonzalez testified that, during his captivity, his abductors asked him numerous times for information about his brother, Francisco, including where he was and how much money he had. As it turned out, Medina-Gonzalez was released only with significant efforts from his brother, who testified at his hearing. Francisco was contacted on his U.S. business telephone by Medina-Gonzalez's captors the day after he was abducted. The captors told Francisco that his brother was being held and that he would be released only in exchange for a $100,000 ransom. Despite Francisco's efforts, he was able to collect only approximately $20,000 of the $100,000 ransom the kidnappers demanded. He contacted his cousin, Martina, who works for the government in the city of Zacatecas, for assistance; she told him that it was too dangerous for her to help, and that, for the same reason, other authorities also would not help him. She referred him to a Mr. Lopez, an attorney in Mexico who routinely acts as a mediator between hostage-takers and the families of hostages. Francisco paid Lopez $5,000 and paid the kidnappers $15,000, in order to secure Medina-Gonzalez's release. Francisco also testified that Lopez, who dealt frequently with this sort of situation, told him that the individuals who had kidnapped his brother were members of the Zetas.

The abductors' targeting of Medina-Gonzalez did not end with his release. They had released him with a threat that if he ever mentioned his abduction to the police, his kidnappers would kill him or his family. In January 2003, his captors once again reached out to Francisco, calling his cell phone. The same person who had spoken with him previously demanded more money, as well as the deeds to properties and vehicles that Francisco and Medina-Gonzalez owned in Mexico. He told Francisco that, although they had released Medina-Gonzalez, they knew where he was hiding in Mexico, and that they would kill him if they did not receive the additional money and title to the properties. Further, the captors let Francisco know that they were aware of details of his life in the United States—including details about his Colombian wife, who had never traveled to Mexico.

After this phone call, Francisco cancelled his cell phone account and arranged for his brother to travel to the United States. Francisco has continued to experience harassment at his business in California. Suspicious men have contacted his employees and come to his business in person to ask employees about him. Francisco testified that such incidents had occurred only a few weeks before his testimony. Francisco testified that he continued to fear that the individuals who were harassing him were connected to the Mexican drug cartel that abducted his brother.

Medina-Gonzalez entered the United States in January 2009. In May 2009, he was placed into removal proceedings and charged under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), as an alien who was not in possession of a valid document to enter the United States at the time of his application for admission. He subsequently filed an application for asylum, withholding of removal, and CAT

relief.  He alleged, *inter alia*, that he had been persecuted on account of his membership in a particular social group consisting of landowners in Mexico.[1]

At a hearing before an IJ, Medina-Gonzalez also presented the testimony of an expert witness, Dr. William Avilés, a professor at the University of Nebraska specializing in Latin American politics and in particular the effects of U.S. drug policy in Mexico.  Dr. Avilés testified as to the prevalence of kidnapping such as that suffered by Medina-Gonzalez in Mexico.  Further, Dr. Avilés testified (and provided a written affidavit confirming) that the history of landownership in Medina-Gonzalez's family was likely to draw attention of drug cartels to him as a target for abduction. Dr. Avilés also documented the successful efforts by cartels to co-opt police in their criminal activities, noting that repeated efforts to "cleanse" the police forces of corruption have failed.  Medina-Gonzalez and his brother both also testified at the IJ hearing, and the testimony of all three witnesses was deemed credible.  The IJ, however, denied Medina-Gonzalez's claims for relief and ordered him removed.

The BIA affirmed the IJ's order in an unpublished, one-member decision.  The BIA held that the social group identified by Medina-Gonzalez was not "defined . . . with sufficient particularity to qualify as a 'particular social group'

---

[1] The government contends that Medina-Gonzalez described himself as a member of a particular social group consisting of "landowners in Mexico *who are targeted by the drug cartels*" (emphasis added).  As stated below, however, we do not believe that the addition of the phrase "who are targeted by the drug cartels," to the extent that it accurately reflects the basis of Medina-Gonzalez's claim, affects our conclusion here.

under the Act" and lacked the "necessary social visibility to qualify as a 'particular social group.'" The BIA also denied Medina-Gonzalez's CAT claim, holding that he had not established the "acquiescence of a government official" in any potential torture he might suffer. Medina-Gonzalez timely filed a petition for review with this court.

## C.

We have jurisdiction over these petitions for review under INA § 242(a)(1), 8 U.S.C. § 1252(a)(1). "We review the BIA's purely factual determinations for substantial evidence. However, we review *de novo* both purely legal questions and mixed questions of law and fact requiring us to exercise judgment about legal principles." *Mendoza-Pablo v. Holder*, 667 F.3d 1308, 1312 (9th Cir. 2012) (internal quotations and citations omitted). When, as here, the BIA "conduct[s] an independent review of the IJ's findings, we review the BIA's decision and not that of the IJ." *Id.*

We have recognized that the phrase "particular social group" is ambiguous. *See Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1083 (9th Cir. 2013) (en banc). Unpublished, one-member decisions of the BIA, however, are not entitled to *Chevron* deference. *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1012-13 (9th Cir. 2006). Instead, they are accorded *Skidmore* deference "proportional to [their] thoroughness, reasoning, consistency, and ability to persuade." *Lezama-Garcia v. Holder*, 666 F.3d 518, 524–25 (9th Cir. 2011) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)) (internal quotations omitted).

## II.

For almost thirty years, the BIA has recognized that landownership may form the basis of a particular social group within the meaning of the INA.  In *Matter of Acosta*, the first case in which the BIA defined the term "particular social group," the BIA held that "persecution on account of membership in a particular social group" is "persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic."   19 I. & N. Dec. 211, 233 (BIA 1985). Among the examples of criteria enumerated by the BIA as giving rise to a particular social group was "a shared past experience such as . . . land ownership." *Id.*  In 1996, the BIA re-affirmed that definition. *See In re H-*, 21 I. & N. Dec. 337, 342 (BIA 1996).  More recently, in cases refining the definition of "particular social group" with reference to factors such as particularity and social visibility, the BIA has continued to assert that landownership may form the basis of membership in a particular social group.  In *In re C-A-*, the BIA explicitly pointed to "land ownership" as an example of an "easily recognizable trait[]" that may be the basis of membership in a particular social group. 23 I. & N. Dec. 956, 960 (BIA 2006); *see also In re A-M-E & J-G-U-*, 24 I. & N. Dec. 69, 73 (BIA 2007) (again affirming the *Acosta* definition).

Both our court and other circuits have followed the BIA's lead in recognizing that landownership may be the basis of a particular social group.  In multiple cases, we have cited with approval the BIA's enumeration, in *Acosta*, of landownership as an illustrative example of a characteristic that might form the basis of a particular social group.  *See Donchev v. Mukasey*, 553 F.3d 1206, 1216–17 (9th Cir. 2009);

*Hernandez-Montiel v. INS*, 225 F.3d 1084, 1091–93 (9th Cir. 2000). The Seventh Circuit in 2005 recognized a social group quite similar to that urged by Cordoba here, consisting of "members of the educated, wealthy, landowning class in Colombia" who were persecuted by members of the FARC. *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 668 (7th Cir. 2005). It did so by noting that the BIA's own cases, such as *Acosta*, supported recognition of a social group based on landownership, and added that even casual readers of Latin American literature "will recall that the history of conflict between large landowners and the rest of society is a long one in Latin America." *Id.* at 672–73.

Furthermore, both Petitioners offered evidence suggesting that landowners in their respective countries are targets of persecution. Cordoba, for example, offered country conditions materials showing that the FARC specifically targets "wealthy landowners." A report published in 2000 by the United States government stated that the FARC maintains "archives listing owners of real estate and property prices in Bogota and other cities" in order to find victims for its extortion efforts. Similarly, Medina-Gonzalez offered credible expert testimony from Dr. William Avilés, a professor specializing in Latin American politics at the University of Nebraska. Dr. Avilés noted that the fact that the Medina-Gonzalez family had "been established land owners in this region for generations" was a significant factor suggesting why Medina-Gonzalez had been targeted by drug cartels.

Although it is questionable whether the agency's decisions in these cases merit *Chevron* deference, we do not decide the issue. *See Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82

(2005) (holding that an agency must "adequately explain[] the reasons for a reversal of policy" in an interpretation that is itself "otherwise entitled to *Chevron* deference"); *Marmolejo-Campos v. Holder*, 558 F.3d 903, 914 (9th Cir. 2009). Instead, we remand in light of clear inconsistencies between the BIA's decisions and our recent *en banc* opinion in *Henriquez-Rivas*—a decision of which the BIA did not have the benefit when it made its decisions. *Henriquez-Rivas* is directly relevant to the questions before the BIA. First, in our opinion in *Henriquez-Rivas*, we clarified, in important ways that are directly relevant to Petitioners' proposed social groups, the BIA's inquiry into whether a social group has sufficient social visibility. As an initial matter, we concluded, consistent with precedents from other circuits, that the social visibility inquiry cannot "require 'on-sight' visibility." 707 F.3d at 1088. Instead, we held that the proper inquiry is whether the shared characteristic would "generally be recognizable by other members of the community," or whether there was "evidence that members of the proposed group would be perceived as a group by society." *Id.* at 1088–89 (internal quotation marks omitted). Further, we noted that there were multiple possible perspectives from which the visibility of a social group might be perceived—from that of the society in question as a whole, to that of the residents of a particular region, or members of a different social group. We suggested that the views of society as a whole were not necessarily dispositive, and that "social visibility may be demonstrated by looking to perceptions of the persecutors," which we held were "highly relevant to, or even potentially dispositive of, the question of social visibility." *Id.* at 1090.

Further, in explaining the characteristics that may form the basis of a "particular social group," our opinion in

*Henriquez-Rivas* explicitly relied on *Acosta*'s use of landownership as an example of a characteristic that fit within the BIA's definition:

> Referencing *Acosta*'s examples of ''former military leadership or land ownership'' during its discussion of ''social visibility,'' the BIA [in *C–A–*] called them ''easily recognizable traits.'' *C–A–*, 23 I. & N. Dec. at 959–60. Those traits would not be ''easily recognizable'' if the ''social visibility'' criterion required ''on-sight'' visibility, since former military officers do not always wear epaulets, nor do landowners wear T-shirts mapping their holdings. Instead, the key in these older BIA cases, as well as in *C–A–*, is whether the social groups are ''*understood* by others to constitute social groups.'' *Id.* at 959 (emphasis added).

*Henriquez-Rivas*, 707 F.3d at 1088. *Henriquez-Rivas* thus not only modified the nature of the social visibility inquiry, but did so while once again citing landownership as a defining example of a characteristic that may be the basis for membership in a "particular social group." Accordingly, *Henriquez-Rivas* provides substantial additional support for the proposed social groups offered by petitioners.

*Henriquez-Rivas* also appears to undermine one justification for the BIA's decisions in the cases before us: that the social groups urged by Cordoba and Medina-Gonzalez would be too broad, or encompass too many diverse elements in society, to constitute a "particular social group." The BIA's decision denying Medina-Gonzalez's appeal, for

example, specifically cited our decision in *Velasco-Cervantes v. Holder*, 593 F.3d 975, 978 (9th Cir. 2010). *Velasco-Cervantes* is one in a line of Ninth Circuit cases focusing on the breadth of a proposed social group, or the diversity of individuals within a proposed social group, as preventing it from constituting a "particular social group." *See id.* at 978 (noting that "any person of any origin can be involuntarily placed" in the social group at issue); *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1577 (9th Cir. 1986) (rejecting a proposed social group because "[i]ndividuals falling within the parameters of this sweeping demographic division naturally manifest a plethora of different lifestyles, varying interests, diverse cultures, and contrary political leanings."); *see also Soriano v. Holder*, 569 F.3d 1162, 1166–67 (9th Cir. 2009) (repeating the *Sanchez-Trujillo* standard); *Ochoa v. Gonzales*, 406 F.3d 1166, 1170–71 (9th Cir. 2005) (same).

In *Henriquez-Rivas*, the en banc court expressly rejected this line of cases as too narrowly defining what constitutes a particular social group. We noted that the reasoning underlying these cases proved deficient, especially when the particular social group inquiry was properly construed in light of the perceptions of the persecutor. *See Henriquez-Rivas*, 707 F.3d at 1090 (noting that if, "as far as the persecutor is concerned, there is a particular characteristic . . . that defines a finite collection of individuals as a group . . . , the fact that these individuals may have a variety of *other* characteristics . . . would not be a bar to potential relief"). We concluded that "[t]he diversity of 'lifestyles' and 'origin' to which [our prior] cases refer[red]" did not accurately describe whether a group was sufficiently "particular" to constitute a "particular social group;" "nor," as we held, "are they relevant to our analysis." *Id.* at 1093–94. Accordingly, we explicitly overruled both *Velasco-Cervantes* and *Soriano* as no longer

accurately describing what constitutes a particular social group. *Id.* Our rejection in *Henriquez-Rivas* of these precedents focusing on the breadth or diversity of membership within a proposed social group thus affects the particular social group inquiry in a substantial way that requires the BIA to re-evaluate its conclusions regarding the proposed social groups here.[2]

Our opinion in *Henriquez-Rivas* also directly addresses one of the government's contentions as to why Petitioners' proposed social groups cannot constitute a "particular social group." Specifically, the government contended that even if landowners *per se* might, consistent with the BIA's precedents, form a particular social group, the addition of *other* characteristics (e.g., "wealthy" or "educated" landowners) somehow invalidates the social group. We reject this contention. As we held in *Henriquez-Rivas*, if, "as far as the persecutor is concerned, there is *a* particular characteristic

---

[2] For purposes of determining a social group, landownership may appear to be indistinguishable from wealth in many aspects. The BIA has held, however, that the latter attribute does not, standing alone, generally form the basis of a particular social group. *See A-M-E*, 24 I. & N. Dec. at 73–76. Its reason for so holding was that it found wealth to be too "indeterminate," in that it might "vary from as little as 1 percent to as much as 20 percent of the population," and that it would be too difficult to determine who the members of the purported class would be. *Id*. at 76. The BIA noted, nevertheless, that "in appropriate circumstances, 'wealth' may be a shared characteristic of a social group," when the group is more "defined" (such as when a government or an uncontrolled rebel group targets individuals above an established income level). *Id.* at 75 n.6. The BIA has recognized that, in contrast, "land ownership" is an "easily recognizable trait[]," *see C-A-*, 23 I & N. Dec. at 959–60, and, even in its decisions distinguishing wealth, has recognized landownership as a "common, immutable characteristic," *see A-M-E-*, 24 I. & N. Dec. at 73; *see also Tapiero de Orejuela*, 423 F.3d at 672.

. . . that defines the collection of individuals as a group," then a petitioner has adequately defined his particular social group. *Id.* at 1090 (internal citation omitted). "[T]he fact that those individuals may have a variety of *other* characteristics, and belong to various *other* groups, would not be a bar to potential relief." *Id.* Thus, the BIA may not rest its denial of asylum on the claim of an additional characteristic when the individual has asserted membership in a particular social group that the BIA has recognized as such. Nor is the easy recognition of landownership changed when a petitioner proposes additional characteristics that other landowners may or may not share. *Id.*

### III.

We address finally the CAT claim raised by Medina-Gonzalez. Medina-Gonzalez predicated his CAT claim on the behavior of the police during the two-and-a-half-hour drive from his home to the place where he was held. As he credibly testified, at multiple police checkpoints, the police appeared to aid his captors by responding when his captors asked "if everything was clear." The BIA rejected his CAT claim because it held that there was no proof that "the police were aware that he was being held captive or that they knew the men holding him." In our recent decision in *Tapia-Madrigal v. Holder*, however, we noted that "[a]lthough the public official must have 'awareness' of the torturous activity" in order for an applicant to qualify for CAT relief, "he need not have actual knowledge of the *specific incident of torture*." 716 F.3d 499, 509 (9th Cir. 2013) (emphasis added). Further, we noted that "corruption of public officials in Mexico remains a problem, particularly at the state and local levels of government, with police officers and prison guards frequently working directly on behalf of drug cartels."

*Id.* at 510. Considerable evidence in the record—including the results of an investigation provided by Medina-Gonzalez's expert, Dr. Avilés, finding that as many as 90% of federal police have some manner of link to a cartel—supports a similar conclusion here. We therefore remand for reconsideration of Medina-Gonzalez's CAT claim in light of our decision in *Tapia-Madrigal*.

## IV.

For the reasons stated above, we grant Cordoba and Medina-Gonzalez's petitions for review as to their asylum claims based on their membership in a particular social group, and we remand for the BIA to reconsider its determinations that the particular social groups offered by Petitioners are not cognizable under the INA, in light of our en banc decision in *Henriquez-Rivas*. We leave to the BIA to address in the first instance whether the harm suffered by Petitioners constituted persecution and whether that persecution was "on account of" a protected basis. *INS v. Orlando Ventura*, 537 U.S. 12, 18 (2002). Because, in both of these cases, the BIA denied Petitioners' withholding of removal claims on the same basis as their asylum claims, we also reverse and remand those determinations. We further

grant Medina-Gonzalez's petition for review as to his CAT claim, and remand for reconsideration of that claim in light of our recent decision in *Tapia-Madrigal*.[3]

   **Petition for Review in 08-74384 DENIED in part; GRANTED in part; REMANDED.**

   **Petition for Review in 10-73112 GRANTED; REMANDED.**

---

ZOUHARY, District Judge, concurring in part and dissenting in part:

   Respectfully, I concur with Section II and dissent from Section III.

   I concur in the judgment of the asylum claims but write separately to clarify that remand is appropriate because the BIA decisions in these cases came down before the recent en banc opinion in *Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013). The BIA should re-examine the record to determine whether there was "evidence that members of the proposed group would be perceived as a group by society." *Id.* at 1088–89. Specifically, was social visibility

---

[3] Cordoba also petitions for review of the BIA's decision denying his claim for relief under the Convention Against Torture, and denying his claim for asylum to the extent that it is based on persecution on the basis of his political opinion. We hold that the BIA's denial of these claims is supported by substantial evidence, and thus deny his petition for review as to them. *See Santos-Lemus v. Mukasey*, 542 F.3d 738, 748 (9th Cir. 2008) (CAT); *INS v. Elias-Zacarias*, 502 U.S. 478, 482–83 (1992) (political opinion).

demonstrated through the perceptions of the persecutors? *Id.* at 1089–90.

A remand for this limited purpose will enable the parties and the BIA to address these questions in the first instance. Comments by the majority, purporting to modify Petitioners' proposed social groups or to steer the IJ or BIA to a particular conclusion, defeat the purpose of the limited remand. For these reasons, I concur separately with Section II.

I dissent from Section III, which addresses Medina-Gonzalez's CAT claim. I believe the BIA's denial of this claim, as with the denial of Cordoba's CAT claim, is supported by substantial evidence and would affirm. The recent decision in *Tapia-Madrigal v. Holder*, 716 F.3d 499, 509 (9th Cir. 2013) does not mandate a remand where, as here, the record supports the conclusion that the sole support for CAT relief — a car ride through several police checkpoints with Medina-Gonzalez allegedly held captive — did not satisfy his burden. As the BIA properly held: "[Medina-Gonzalez] did not show that the police were aware that he was being held captive or that they knew the men holding him."